81 N.J. Super. 65 (1963)
194 A.2d 591
THE GRAND UNION COMPANY, A DELAWARE CORPORATION, HOME LIQUORS, A NEW JERSEY CORPORATION, PACKARD-BAMBERGER & CO., INC., A NEW JERSEY CORPORATION, VORNADO, INC., A KANSAS CORPORATION, CHICKEN BARN, INC., A NEW JERSEY CORPORATION, HERMAN SZOKOLAR, MAURICE WILLNER AND HERBERT HUBSCHMAN, PLAINTIFFS,
v.
ARTHUR J. SILLS, ATTORNEY GENERAL OF NEW JERSEY, WILLIAM HOWE DAVIS, DIRECTOR OF THE DIVISION OF ALCOHOLIC BEVERAGE CONTROL OF NEW JERSEY, HERMAN ADES AND ABE STERN, T/A WAVERLY LIQUORS; LOUIS AND ANNE KANDEL, T/A CROWN WINE & LIQUOR CO.; IRVING LIPTON, T/A LIPTON'S WINES AND LIQUORS; PHILIP SOSNI, T/A HADDON LIQUOR STORE, INC., JOSEPH KELLEY, T/A JAYKAY LIQUOR; AND SOUTH JERSEY RETAIL LIQUOR STORES ASS'N., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 28, 1963.
*66 Messrs. Meyner & Wiley, attorneys for plaintiffs (Mr. Stephen B. Wiley, of counsel; Mr. C. Douglas Hofe, Jr., on the brief).
Mr. Arthur J. Sills, Attorney General pro se, and attorney for defendant William Howe Davis, Director of the Division of Alcoholic Beverage Control of New Jersey (Mr. David J. Goldberg, of counsel).
Messrs. Shanley & Fisher, attorneys for defendants Herman Ades et al. (Mr. Samuel Moskowitz, of counsel; Mr. John Kandravy, on the brief).
Messrs. Richman, Berry & Ferren, attorneys for defendants Philip Sosni et al. (Mr. Grover C. Richman, Jr., of counsel; Mr. Robert W. Page, on the brief).
*67 LYONS, J.C.C. (temporarily assigned).
This is an action in lieu of prerogative writs. Plaintiffs, holders of retail liquor licenses or having interests therein, seek a declaratory judgment that chapter 152 of the Laws of 1962, N.J.S.A. 33:1-12.31 et seq., is unconstitutional. The original defendants, the Attorney General of New Jersey and the Director of Alcoholic Beverage Control, have been joined by certain other defendants connected with the retail liquor industry, whose petitions to intervene were not contested.
Briefly put, the statute in question limits the number of retail alcoholic beverage licenses that may be held by any one person to two. The curb is prospective only. Plaintiffs and those similarly situated will not be disturbed in their present multiple license holdings, but they are prohibited from acquiring additional licenses.
Plaintiffs' attack moves along diverse lines. I shall first deal with the complaint that the statute bears no reasonable relation to the attainment of any proper public objective, and that it is, in fact, designed solely to advance the interests of the distillers of national brands, so-called.
All of the evidence in this case has been produced by plaintiffs. The range of proof is quite comprehensive, covering the relation of the statute to such subjects as enforcement of the liquor laws, bootlegging, public health, temperance, the retail dispensing structure, and the economic effects of such a law. Expert testimony was furnished by two professors of economics, Drs. Baldwin and Markham, which delineated in large part the adverse effects that would be visited upon the public and upon certain segments in the chain of supply from the distiller to the ultimate consumer.
The paths of the professors were beset by frequent objections to their competency to go beyond the field of economics and to make expert appraisals of the likely effects of such legislation on bootlegging, law enforcement, temperance and other problems that feature the highly specialized field of alcoholic beverage distribution. In the interest of avoiding the need for a later remand to this court to take additional *68 evidence in the event that an appellate court might desire additional information, the record was made as expansive as possible so that it might include all that could possibly be said to be germane to the resolution of the issues.
Of course, the obvious starting point for discussion is to state the general rule that the instant enactment enjoys a presumption of constitutionality and that it is the duty of the court to sustain the legislation, if at all possible. Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 225 (1960). Since the Legislature has not declared its purpose by preamble or other statement, the search of the court must, if need be, cover the exploration of all reasonable tenable grounds.
From my reading of the testimony and the exhibits there emerges the impression that plaintiffs have presented a frank espousal of the free enterprise system, with its accordant benefits to the wide-awake, energetic retailer and the thrifty, price-conscious buyer. The vehicle of favor to both in the field of alcoholic beverages is the continued development of competition between private brand beverages and those that are called national brands. While it appears that even the small one-store retailer may acquire a stock of private brands, the price advantage offerable by him to the consumer is not nearly so great as that which can be offered by chain retailers, since their great volume of sales leads to the attainment of a much lower unit price than is obtainable by the small retailer, whose blending, bottling and labeling has to be done in small quantities. It is notable that in the case of chain buying of stocks, the licensed wholesaler's position in the transaction is often merely nominal, since all negotiations subsequent to the placing of the order are carried on directly by the buyer with the distiller. Reaching a large segment of the consumer market is an easier task when the purveying of package goods is done by a supermarket. Here, it is said, there is a well-founded expectation that the housewife will count it a part of her shopping chores to procure the liquor *69 for the "polite social affairs" that are a part of the life of the household.
In the 30 years that have passed since our Alcoholic Beverage Control Act was promulgated, almost 600 licenses have come into the hands of multiple holders. About two-thirds of these are held by owners of two outlets. Of the remaining multiple operations, almost 200 are controlled by 11 licensees who have acquired five or more licenses, each. Outstanding in this small number of retailers are five who control groups of outlets in varying numbers from 14 to 77. The largest holder is a well-known supermarket chain. Two chains of stores dealing solely in alcoholic beverages control a total of 49 licenses. Thus, certain examples of "bigness" stand out sharply in the retail field.
One of the witnesses stated it to be a fair assumption that in the absence of such restriction as the statute imposes, the chains would continue to expand their retail liquor operations by acquiring more licenses in choice locations. He emphasized that it would not be economically sound for a chain to over-cultivate any particular area, since their stores would then be competing with each other. Dispersion would continue to be a characteristic of their expansion. It was admitted that the business prospects of small dealers would be adversely affected by chain competition, particularly in the pricing field, but it was said that the effects of this competition could be softened in several ways: by the burgeoning demands for liquor generated by increased population; by the opportunity of the small retailer to gain and hold business by credit extension, home deliveries, catering, and the performance of other special services not feasible in chain operations; and by the fact that many consumers will always cleave to national brands.
It is patent that the decision of this case cannot turn solely on economic considerations. The cogency of plaintiffs' proofs cannot be measured by the tenets of the market place. What is recognized as sound, aggressive marketing in the grocery business may be positively abhorrent in the sale of alcoholic beverages. Control of the liquor traffic has ever been *70 a worrisome problem. Restriction is the very soul of our statute. Thirty years old, the ABC Act continues to undergo amendment, usually in the same direction  more control.
The witnesses in this case deserve due respect for their candor in describing the narrowness of their approach to consideration of the problems entailed in this legal conflict. They emphasized repeatedly that their appraisals of the effects of chapter 152 were based solely on economic considerations and that they claimed no expertness in the fields of sociology or politics. When their opinions were merely the "logical" deductions of laymen, they said so. It is my view that their testimony and reports fall far short of demonstrating that the statute does not embody a lawful use of the police power to attain a proper public purpose. In many respects the contrary seems indicated.
I regard this legislation as a forehanded attempt by the Legislature to ward off the possibility of the occurrence of serious derangement of the liquor industry at the retail level. It is not difficult to see that the further growth of chain operations is likely to cause demoralization of the small retailer's economic condition in many areas of the State. Pricing policies that are geared solely to economics and profits can be most harmful. We must take conditions as we find them. When the Legislature drew the regulatory charter to govern the sale of alcoholic beverages, it chose to entrust the retailing of package goods to private enterprise. Some other states chose to keep control through the operation of state stores. However, enterprise in this field has been encased from the start by a multitude of restrictive rules to keep a tight rein on its operation. As economists would see it, "private enterprise" in this domain is a grand misnomer. Promotion of temperance and the avoidance of abuses have always been the aims of the State in its regulatory function. More than once, when private enterprise has gotten out of hand in its push for sales, curbs have been devised to overcome existing dangers. Thus, in 1938 the Director received a grant of power to enforce fair trade prices when the industry was faced by ruinous *71 conditions brought on by indiscriminate price cutting. N.J.S.A. 33:1-23.1. And in 1939 it was found necessary to enact a statute forbidding manufacturers and wholesalers from granting discriminatory rebates, discounts, or other inducements to selected retailers, the purpose of this regulation being to stamp out destructive wars that had caused intemperance and harm to the industry. So, it stands evident that the maintenance of stability in the retail field has been a major concern of the Legislature.
Whether the stability is threatened by price wars, or by the granting of discriminatory boons, or by intrusion of chain operation into the field, the result is essentially the same. I am satisfied that the Legislature could have viewed the growth of chain operations as portending great harm. The continued spread of lower-priced items through the marketing of private brands by these enterprises poses a real economic threat to the individual retailer, who admittedly is practically restricted to the sale of higher-priced national brands. The expedients that plaintiffs suggest so that the small retailer may maintain his competitive position, to wit, credit sales, home deliveries, catering and party items, are all items of additional expense that he must assume  just to compete. And though he is assured that a "buoyant" market awaits him in the future, he can vie for part of that market only on the same costly terms. That this is so now is conceded. That this uneven competition would continue to spread as opportunity arose, is assured. I must observe that the inferiority of the individual retailer's position is not fully outlined in terms of price disadvantage, for when the competitor is a grocery or general merchandise chain, there is the additional factor that its economic existence is maintained by profits from many lines, whereas the liquor retailer is restricted to that line alone for his income. It is somewhat ironical, as I see it, that a factor in our problem is the effect that large merchandising chains have on competitive vendors, even though they be far removed from the site of a chain outlet. Establishment of vast shopping centers and modern means of *72 quick travel have made the pursuit of a bargain less and less onerous, and even attractive, and the pull of the neighborhood store on the score of convenience has been lessened.
Though we acknowledge plaintiffs' claims that the instant statute will deprive substantial segments of the buying public of the chance to enjoy the benefits of lower liquor prices made possible by efficient and aggressive retailing, that it will stifle the growth of private brands, and that it will inhibit the growth of many small distillers and rectifiers, the answer to all of this is that there are some things that we cannot afford. The liquor industry is sui generis. If conditions of competition come about that threaten the economic existence of a vast number of small retailers, there exists a real threat that they may take illegal shortcuts to maintain their solvency, to the detriment of the industry, and the harm of the public.
While it seems unnecessary to discuss the question of the effect that reduced prices might have on temperance, since this matter was but little discussed on the oral argument, I take the opportunity to express the view that the likely effect is adverse. I am not impressed by the statements made to the contrary by the experts in respect to this subject. I prefer the view expressed by the Legislature on at least two occasions, namely, that price cutting is subversive of temperance.
We now deal with certain other alleged infirmities that are said to render this statute unconstitutional.
There is the claim that the act is hopelessly vague. It is said that it is impossible to know what is the legislative intent in respect to the right to acquire a beneficial interest in a liquor license, since section 1 seems to permit the acquisition of not more than two after the effective date of the act, regardless of the number already held, while section 3, dealing with acquisition by descent, prohibits any such acquisition by a person who already holds two or more licenses. I am of the opinion that a reading of the entire act conveys the clear impression that, with certain exceptions, all acquisitions after the effective date of the act are forbidden if a person already has two or more licenses. In arriving at the true meaning of *73 the statute one must take into account that multiple holders of licenses at the time the legislation became effective are not disturbed in the possession of those licenses, regardless of their number.
Then there is the claim that the expression, "beneficial interest," projects no sure concept of the legislative thinking. It is contended that in the absence of statutory definition, the term is meaningless. "Beneficial interest" is a phrase not new in the law. As was pointed out in argument, that phrase and similar expressions are found in a number of ABC regulations. Bouvier defines it. It is used in our Wills Act and has been judicially interpreted in that context. N.J.S. 3A:3-6; In re Rogers Estate, 15 N.J. Super. 189, 206 (Cty. Ct. 1951). Other jurisdictions have dealt with its meaning. All in all, it may be said that reliable guides to its interpretation are to be found.
Plaintiffs also take the position that the statute is invalid because it works a deprivation of property without due process of law. Instances are cited where the act is said to inflict serious financial harm. It is said that an individual holder of three or more licenses is unable to dispose of his business, except on a piecemeal basis, thus losing the benefits that accrue from sale of his enterprise intact. And it is pointed out that the holder of a block of stock in a corporation which holds more than two licenses, and whose stock is privately held and traded, is unable to dispose of his interest in any way. And yet, it is argued, Section 6 saves to any person having a beneficial interest in a retail license or licenses the right to acquire an interest of not more than 10% in a corporation whose shares are publicly traded in one of the markets stipulated in the statute.
It would seem to be a broad answer to these objections to stress the peculiar nature of the thing which is the subject of legislative concern, namely, retail liquor licenses. They are merely grants of privilege to operate in the liquor dispensing business and are completely subject to regulation by the Legislature. They carry with them no property rights. Their *74 nature and the right of the Legislature to change the law respecting them are not altered by the fact that the shares of stock in a corporation are property and that they represent the ownership of other assets in addition to the license. Obviously, an investor courts great risks when he puts his money into a business that is so open to the exercise of the legislative will in the protection of the public weal. Crippling controls may wipe out his chance for a reasonable return; prohibition may obliterate his investment altogether.
If shareholders in such corporations wish to lessen the financial risks, the Legislature appears to have left open the way by the provisions of section 6. There does not appear to be any bar to their changing the capital structure of the corporation and making application so that its shares may be traded in one of the acceptable public markets.
I am satisfied that the legislation here under review is not unconstitutional for any of the reasons argued.
Judgment for defendants. A judgment, consented to as to form, may be submitted, or the terms of the judgment may be settled in open court.