[S. F. No. 22212. In Bank. Dec. 1, 1966.]

WILKE AND HOLZHEISER, INC., Plaintiff and Appellant, v. DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL et al., Defendants and Respondents.

354.

Cerf, Robinson & Leland, Marcel E. Cerf and Herbert A. Leland for Plaintiff and Appellant.

M. Mitchell Bourquin, Barbagelata, Broderick, Carmazzi & Arnold, Rinaldo A. Carmazzi, Leslie, Schiffer & Rubin and Daniel A. Schiffer as Amici Curiae on behalf of Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, E. G. Funke, Assistant Attorney General, Wiley W. Manuel, L. Stephen Porter and Harold W. Teasdale, Deputy Attorneys General, for Defendants and Respondents.

Shirley, Saroyan, Cartwright & Peterson and Lowell H. Sucherman as Amici Curiae on behalf of Defendants and Respondents.

TOBRINER, J.—Plaintiff Wilke and Holzheiser, Inc., appeals from four separate judgments, each denying a writ of mandate seeking review of administrative decisions of the Department of Alcoholic Beverage Control which suspended or revoked the licenses of plaintiff's San Francisco liquor stores. In each decision the department found that plaintiff had sold distilled spirits in violation of the mandatory retail price maintenance provisions of the Alcoholic Beverage Control Act. (Bus. & Prof. Code, §§ 24749-24757.)[1]

Plaintiff asks that we reverse these judgments on the grounds that the price maintenance provisions violate constitutional imperatives and that, in any event, section 24755.1 of the Business and Professions Code precludes the imposition of the penalties of license suspension and revocation. Plaintiff further asks that we reverse the judgments because of errors in the administrative proceedings which the trial court refused to review. For reasons which we explain hereinafter, we hold that the price maintenance provisions do not transgress constitutional requirements, that section 24755.1 does not apply to the instant case, and that the alleged errors in the administrative proceedings do not call for reversal.

## 1. *Constitutionality of the retail price maintenance provisions*

At the outset we note that several states in addition to our own have adopted measures requiring that each producer of liquor establish a price below which retail distributors may not sell his brand. The courts which have passed on the constitutionality of such measures have reached divergent conclusions.[2] In this court the matter is not one of first impression:

---

[1]The first judgment involved decisions suspending the license of plaintiff's Market Street store for a total of 150 days and suspending the license of plaintiff's Minna Street store pending transfer of the license to an acceptable licensee; the second and third judgments each involved decisions suspending both licenses for 15 days; and the fourth judgment involved decisions revoking both licenses. All four judgments were rendered on April 1, 1964, and all claimed violations occurred prior to 1961.

[2]Mandatory price maintenance provisions requiring compliance with minimum liquor prices set by producers were held constitutional in *Schwartz* v. *Kelly* (1953) 140 Conn. 176 [99 A.2d 89]; *Reeves* v. *Simons* (1942) 289 Ky. 793 [160 S.W.2d 149]; *Supreme Malt Products Co., Inc.* v. *Alcoholic Beverages Control Com.* (1956) 334 Mass. 59 [133 N.E.2d

In *Allied Properties* v. *Department of Alcoholic Beverage Control* (1959) 53 Cal.2d 141 [346 P.2d 737], we held that the retail price maintenance provisions here involved were constitutional. In so deciding, we rejected the arguments which plaintiff asks us to accept now.

Plaintiff urges us to reconsider *Allied Properties* on the ground that the majority of other state courts which have subsequently passed on the constitutionality of general fair trade legislation authorizing retail price maintenance agreements have held such legislation unconstitutional as applied to nonsigners.[3] Not one of these subsequent decisions, however,

775]; *Gaine* v. *Burnett* (1939) 122 N.J.L. 39 [4 A.2d 37], affd. per curiam, 123 N.J.L. 317 [8 A.2d 604]. Such provisions were held unconstitutional in *Scarborough* v. *Webb's Cut Rate Drug Co., Inc.* (1942) 150 Fla. 754, 772 [8 So.2d 913]; *State ex rel. Anderson* v. *Mermis* (1961) 187 Kan. 611 [358 P.2d 936]; *Reynolds* v. *Louisiana Board of Alcoholic Beverage Control* (1965) 249 La. 127 [185 So.2d 809], cert. den. (1966) 385 U.S. 946 [17 L.Ed.2d 225, 87 S.Ct. 318]; *Drink, Inc.* v. *Babcock* (N.M. 1966) 421 P.2d 798.

[3] The federal courts have uniformly found no conflict between such legislation and the federal Constitution. (See *G.E.M. Sundries Co.* v. *Johnson & Johnson, Inc.* (9th Cir. 1960) 283 F.2d 86, 90-92; see the cases collected in *Parke, Davis & Co.* v. *G.E.M., Inc.* (D.Md. 1962) 201 F.Supp. 207, at 211-213; see also *Hudson Distributors, Inc.* v. *Eli Lilly & Co.* (1964) 377 U.S. 386 [12 L.Ed.2d 394, 84 S.Ct. 1273], rejecting the federal constitutional claim by implication.)

The validity of fair trade laws as applied to nonsigners has been upheld by 16 state courts: *General Elec. Co.* v. *Telco Supply Inc.* (1958) 84 Ariz. 132 [325 P.2d 394]; *Scovill Mfg. Co.* v. *Skaggs etc. Drug Stores* (1955) 45 Cal.2d 881 [291 P.2d 936]; *Burroughs Wellcome & Co.* v. *Johnson Wholesale Perfume Co.* (1942) 128 Conn. 596 [24 A.2d 841]; *General Elec. Co.* v. *Klein* (1954) 34 Del.Ch. 491 [106 A.2d 206]; *Kinsey etc. Sales Co.* v. *Foremost Liquor Stores, Inc.* (1958) 15 Ill.2d 182 [154 A.2d 290]; *Home Utilities Co.* v. *Revere etc., Inc.* (1956) 209 Md. 610 [122 A.2d 109]; *W. A. Sheaffer Pen Co.* v. *Barrett* (1950) 209 Miss. 1 [45 So.2d 838]; *Corning Glass Works* v. *Max Dichter Co.* (1960) 102 N.H. 505 [161 A.2d 569]; *Lionel Corp.* v. *Grayson-Robinson Stores* (1954) 15 N.J. 191 [104 A.2d 304]; *Bourjois Sales Corp.* v. *Dorfman* (1937) 273 N.Y. 167 [7 N.E.2d 30, 110 A.L.R. 1411]; *Eli Lilly & Co.* v. *Saunders* (1939) 216 N.C. 163 [4 S.E.2d 528, 125 A.L.R. 1308]; *Hudson Distributors, Inc.* v. *Upjohn Co.* (1963) 174 Ohio 487 [190 N.E.2d 460]; *Miles Laboratories, Inc.* v. *Owl Drug Co.* (1940) 67 S.D. 523 [295 N.W. 292]; *Plough, Inc.* v. *Hogue & Knott Super Market* (1963) 211 Tenn. 480 [365 S.W.2d 884]; *Standard Drug Co.* v. *General Elec. Co.* (1960) 202 Va. 367 [117 S.E.2d 289]; *Weco Products Co.* v. *Reed Drug Co.* (1937) 225 Wis. 474 [274 N.W. 426].

Fair trade acts have been held unconstitutional as applied to nonsigners in 24 states. The courts in two of these have relied on state constitutional provisions prohibiting price-fixing by private contract: *Union Carbide & Carbon Corp.* v. *Skaggs Drug Center, Inc.* (1961) 139 Mont. 15 [359 P.2d 644]; *General Elec. Co.* v. *Thrifty Sales Inc.* (1956) 5 Utah 2d 326 [301 P.2d 741]. In the remaining 22 states, the courts have held that legislation binding nonsigners to minimum retail prices established by producers exceeds the police power, violates due process, or

has brought to light any relevant consideration which was not thoroughly argued when we decided *Allied Properties.* Under such circumstances, we would ordinarily be most reluctant to reopen a matter so recently and so unequivocally settled by a decision of this court. We have decided to do so here only because of the importance of the issue raised and because of plaintiff's contention as to the contrary trend of the decisions in other jurisdictions; we seek to foreclose any possibility that our silence might engender unwarranted speculation about the continued vitality of *Allied Properties.* ▮ Having reconsidered *Allied Properties,* we reaffirm its holding that the mandatory retail price maintenance provisions of the Alcoholic Beverage Control Act are constitutional.

The provisions in question operate as follows: Section 24750 of the Business and Professions Code authorizes fair trade contracts prohibiting the buyer from reselling, except at the price stipulated by the seller, alcoholic beverages which bear the trade-mark, brand, or name of the producer or owner and

unlawfully delegates legislative power: *Bulova Watch Co.* v. *Zale Jewelry Co.* (1962) 274 Ala. 270 [147 So.2d 797]; *Union Carbide & Carbon Corp.* v. *White River Distributors, Inc.* (1955) 224 Ark. 558 [275 S.W.2d 455]; *Olin Mathieson Chemical Corp.* v. *Francis* (1956) 134 Colo. 160 [301 P.2d 139]; *Miles Laboratories* v. *Eckerd* (Fla. 1954) 73 So.2d 680; *Cox* v. *General Elec. Co.* (1955) 211 Ga. 286 [85 S.E.2d 514]; *Bissell Carpet Sweeper Co.* v. *Shane Co., Inc.* (1957) 237 Ind. 188 [143 N.E.2d 415]; *Bulova Watch Co.* v. *Robinson Wholesale Co.* (1961) 252 Iowa 740 [108 N.W.2d 365]; *Quality Oil Co.* v. *E. I. Du Pont De Nemours & Co.* (1958) 182 Kan. 488 [322 P.2d 731]; *General Elec. Co.* v. *American Buyers Coop.* (Ky. 1958) 316 S.W.2d 354; *Dr. G. H. Tichenor etc. Co.* v. *Schwegmann Bros. etc. Markets* (1956) 231 La. 51 [90 So.2d 343, 60 A.L.R.2d 410]; *Shakespeare Co.* v. *Lippman's etc. Sporting Goods Co.* (1952) 334 Mich. 109 [54 N.W.2d 268]; *Remington Arms Co. Inc.* v. *G.E.M. Inc.* (1960) 257 Minn. 562 [102 N.W.2d 528]; *Zale-Las Vegas, Inc.* v. *Bulova Watch Co.* (1964) 80 Nev. 483 [396 P.2d 683]; *Skaggs Drug Center* v. *General Elec. Co.* (1957) 63 N.M. 215 [315 P.2d 967]; *American Home Products Corp.* v. *Homsey* (Okla. 1961) 361 P.2d 297; *General Elec. Co.* v. *Wahle* (1956) 207 Ore. 302 [296 P.2d 635]; *Olin Mathieson Chemical Corp.* v. *White Cross Stores* (1964) 414 Pa. 95 [199 A.2d 266]; *United States Time Corp.* v. *Ann & Hope Factory Outlet* (R.I. 1964) 205 A.2d 125 [unconstitutional delegation only as applied to nonsigners who purchase without actual notice of resale price restrictions]; *Rogers-Kent, Inc.* v. *General Elec. Co.* (1957) 231 S.C. 636 [99 S.E.2d 665]; *Remington Arms Co.* v. *Skaggs* (1959) 55 Wn.2d 1 [345 P.2d 1085]; *General Electric Co.* v. *A. Dandy Appliance Co.* (1958) 143 W.Va. 491 [103 S.E.2d 878]; *Bulova Watch Co.* v. *Zale Jewelry Co.* (Wyo. 1962) 371 P.2d 409.

Each of the remaining 10 states either has no general fair trade law authorizing retail price maintenance agreements binding on nonsigners or has such legislation but has not yet passed on its validity. In one of these 10 states, Nebraska, the Legislature repealed the fair trade provisions after the highest court of that state had held them unconstitutional. (*McGraw Electric Co.* v. *Lewis & Smith Drug Co.* (1955) 159 Neb. 703 [68 N.W.2d 608].)

are in fair and open competition with others of the same general class. Section 24752 declares that wilfully and knowingly advertising, offering for sale, or selling any alcoholic beverage at less than the price stipulated in any such contract, whether the person so doing is or is not a party to the contract, constitutes unfair competition and founds an action by any person damaged thereby. Section 24755, as it read at the time of the transactions under consideration, required that any branded liquor sold at retail be sold pursuant to a contract executed under the above provisions and prohibited the violation of such contracts by liquor licensees.[4]

Section 24757 authorizes the Department of Alcoholic Beverage Control to adopt such rules as it finds necessary for the administration of section 24755. Rule 99, as adopted and effective at the time of the instant transactions, provided in part that no manufacturer or wholesaler should sell branded liquor except pursuant to a fair trade contract as provided for by sections 24750 and 24755, that copies of such contracts should be filed with the department, and that no licensee should advertise, offer for sale, or sell alcoholic beverages at a retail price less than the minimum resale price stipulated in a contract filed with the department pursuant to this rule. (Cal. Admin. Code, tit. 4, § 99, subds. (a), (b), (f).) Business and Professions Code section 24200 provides in relevant part that the department may suspend or revoke a license when the licensee has violated any rule promulgated by the department pursuant to the Alcoholic Beverage Control Act or any other penal prohibition or regulation of the sale of alcoholic beverages.[5]

■ Plaintiff first contends that these provisions are unconstitutional because they exceed the police power of the state.

---

[4]In 1961 the Legislature changed section 24755 in several respects (Bus. & Prof. Code, § 24755, as amended by Stats. 1961, ch. 635, § 4), but since these amendments became effective on September 15, 1961, after all of the transactions and administrative decisions which are the subject of the present action, they do not affect the instant case. (Cf. pp. 28-36, *infra*.)

[5]Business and Professions Code section 25617, which is not directly involved in the instant case, declares that the violation of any of the provisions of the Alcoholic Beverage Control Act for which the act does not specifically provide another penalty is a misdemeanor punishable by a fine of not more than $500 or by imprisonment in the county jail for not more than six months, or both. The court in *Peck's Liquors, Inc.* v. *Superior Court* (1963) 221 Cal.App.2d 772 [34 Cal.Rptr. 735], held section 25617 applicable to violations of section 24755. Since section 25617 is not involved here, we need not decide either the correctness of *Peck's Liquors* or the effect of section 24755.1 upon section 25617.

In passing upon the validity of that contention, we exercise an extraordinary power over a coordinate branch of government and perform a correspondingly narrow function: we simply determine whether the statute reasonably relates to a legitimate governmental purpose. In so doing, we find the requisite relationship in the absence of an unquestionable contrary showing. (*Los Angeles Met. Transit Authority* v. *Public Utilities Com.* (1963) 59 Cal.2d 863, 867 [31 Cal.Rptr. 463, 382 P.2d 583]; *Wholesale Tobacco Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 646 [82 P.2d 3, 118 A.L.R. 486].) We must not confuse reasonableness in this context with wisdom. " 'The doctrine . . . that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely . . . has long since been discarded . . .' *Ferguson* v. *Skrupa*, 372 U.S. 726, 728-730 [10 L.Ed.2d 93, 83 S.Ct. 1028, 95 A.L.R.2d 1347]." (*Joseph E. Seagram & Sons, Inc.* v. *Hostetter* (1966) 384 U.S. 35, 47 [16 L.Ed.2d 336, 86 S.Ct. 1254].)[6]

To incant these precepts in form and ignore them in substance is to disregard the most basic postulates of representative government; yet, as one court has observed, "the courts of last resort that have rejected fair trade acts on Constitutional grounds seem to have . . . done so because of an unwillingness to accept the legislative judgment as to the economic facts." (*Home Utilities Co.* v. *Revere, etc., Inc., supra,* 209 Md. 610, 617.)[7] On such debatable matters the Legislature properly serves as the court of last resort. ■ When, as in this case, "appeal is made to liberties which derive merely from shifting economic arrangements" (*Kovacs* v. *Cooper* (1949) 336 U.S. 77, 95 [93 L.Ed. 513, 69 S.Ct. 448, 10 A.L.R.2d 608] (Frank-

[6]We have recognized and applied these propositions in a long series of decisions. (See, e.g., *Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d 141, 146-147; *Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 129-130 [216 P.2d 825, 13 A.L.R.2d 252]; *Lelande* v. *Lowery* (1945) 26 Cal.2d 224, 234 [157 P.2d 639, 175 A.L.R. 1109]; *Bodinson Mfg. Co.* v. *California Employment Com.* (1941) 17 Cal.2d 321, 325 [109 P.2d 935]; *Wholesale Tobacco Dealers* v. *National etc. Co., supra,* 11 Cal.2d 634, 646-650; *Max Factor & Co.* v. *Kunsman* (1936) 5 Cal.2d 446, 454-458 [55 P.2d 177].)

[7]See, e.g., *Union Carbide & Carbon Corp.* v. *White River Distributors, Inc., supra,* 224 Ark. 558, 563; *Miles Laboratories* v. *Eckerd, supra,* 73 So.2d 680, 682; *Cox* v. *General Elec. Co., supra,* 211 Ga. 286, 290-291; *Reynolds* v. *Louisiana Board of Alcoholic Beverage Control, supra,* 185 So.2d 794, 809, 811-812; *Shakespeare Co.* v. *Lippman's etc. Sporting Goods Co., supra,* 334 Mich. 109, 115-117; *American Home Products Corp.* v. *Homsey, supra,* 361 P.2d 297, 302-304; *General Elec. Co.* v. *Wahle, supra,* 207 Ore. 302, 318-319, 321.

furter, J., concurring)), the judgment of the Legislature reaches this tribunal with a momentum for respect lacking when the Legislature tampers with "those liberties of the individual which history has attested as the indispensable conditions of an open as against a closed society." (*Ibid.*) With these admonitions in mind, we turn to plaintiff's contention that the retail price maintenance provisions of the Alcoholic Beverage Control Act bear no reasonable relation to any legitimate governmental purpose.

 The Legislature adopted the Alcoholic Beverage Control Act "for the protection of the safety, welfare, health, peace, and morals of the people of the State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages." (Bus. & Prof. Code, § 23001.) With regard to the retail price maintenance provisions specifically, the Legislature made its purpose plain: "It is the declared policy of the State that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages . . . for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars which unduly stimulate the sale and consumption of alcoholic beverages and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of alcoholic beverages should be subjected to certain restrictions and regulations. The necessity for the enactment of provisions of this chapter is, therefore, declared as a matter of legislative determination." (Bus. & Prof. Code, § 24749.)

The promotion of temperance in the consumption of alcoholic beverages and of orderly conditions in their marketing clearly constitute proper legislative objectives. The declared purposes of the Alcoholic Beverage Control Act in general and of its retail price maintenance provisions in particular are therefore entirely legitimate, and we must sustain the price maintenance provisions if they bear a reasonable relationship to any of those purposes.

We turn first to the purpose of promoting temperance. The retail price maintenance provisions proceed on the assumption that "the elimination at the retail level of price cutting, bargain sales, and advertising of low prices tends to reduce excessive purchases of alcoholic beverages." (*Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d

141, 148.) We cannot call such an assumption irrational. In upholding the validity of a state statute limiting retail liquor licenses to two per person, the New Jersey Supreme Court held that in formulating its policy the Legislature could properly accept "widely held views as to sound liquor control," including the "beliefs that the consumption of liquor is elastic rather than inelastic, [and] that price cuttings and their advertisement, along with comparable practices, are undesirable in the liquor field as tending to stimulate consumption. . . ." (*Grand Union Co.* v. *Sills* (1964) 43 N.J. 390 [204 A.2d 853, 859].)

Our Legislature may have sought to prevent the special inducement to purchase liquor which results from loss leaders, price-cutting, and bargain sales at the retail level. (*Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d 141, 148-149.) ▮ That the Legislature did not also seek to prevent intemperance by limiting the volume of liquor sales, by regulating competition among producers and wholesalers, or by establishing high liquor prices generally, creates no constitutional infirmity. ▮ As we said in *Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833 [48 Cal.Rptr. 481, 409 P.2d 481], "The Legislature is not bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident."

The selectivity of our Legislature's approach to the problem of intemperance might reflect a variety of entirely legitimate considerations. Thus the Legislature could have reasoned that some people might respond more impulsively to bargain sales of their preferred brand than to bargains offered by competing brands. Or the Legislature might have concluded that unregulated competition among the relatively few liquor producers and wholesalers would not unduly stimulate liquor consumption but that similar competition among the large number of retailers, who come into direct contact with consumers and who are more vulnerable to economic pressure, would stimulate selling practices calculated to induce intemperance.[8] We cannot say that all of these suppositions would have been " 'palpably arbitrary and beyond rational doubt erroneous.' " (*In*

---

[8] See footnote 9, *infra.*

*re De La O* (1963) 59 Cal.2d 128, 153 [28 Cal.Rptr. 489, 378 P.2d 739, 98 A.L.R.2d 705] ; *State of California* v. *Industrial Acc. Com.* (1957) 48 Cal.2d 365, 371 [310 P.2d 7].)

Plaintiff calls our attention to the fact that the New York Moreland Commission (see New York State Legislative Annual (1964) 401-408, 484-489, 498-500) found that mandatory retail price maintenance did not significantly reduce the consumption of alcoholic beverages. We note, however, that the response to the Moreland Commission Report in New York came from the Legislature (Session Laws of New York, 1964, ch. 531, § 11), not the courts. ■ Legislative revision of a statute cannot be equated to its death knell by judicial decree.

We turn to the second legislative purpose: the promotion of the orderly sale and distribution of alcoholic beverages. Retail price wars among liquor distributors may encourage retailers, struggling to withstand the pressure of ruinous competition, to sell liquor below cost in violation of Business and Professions Code section 17043 or to transgress the regulatory laws governing retail liquor distribution (Bus. & Prof. Code, §§ 25600-25666).[9] To the extent that the retail price maintenance provisions eliminate retail price wars in the liquor industry, they undeniably discourage such disruptive practices.

The Legislature may likewise have concluded that giant retailers and chain markets should be afforded no opportunity to use loss leaders in branded liquor to attract customers in disregard of Business and Professions Code section 17044 and thus ultimately to force smaller retailers out of business. Such tactics, the Legislature may have thought, would disrupt orderly distribution by endangering the continued vitality of one method of marketing: the corner grocery store. The Legislature may have decided not to expose these channels of distribution to possible economic destruction through manipulation, by powerful competitors, of so highly volatile and attractive a product as branded liquor.

Plaintiff answers that the instant legislation reaches unnecessarily far in this respect because the kinds of market-

---

[9]As one court put it, ''The liquor industry is *sui generis*. If conditions of competition come about that threaten the economic existence of a vast number of small retailers, there exists a real threat that they may take illegal shortcuts to maintain their solvency, to the detriment of the industry and the harm of the public.'' (*Grand Union Co.* v. *Sills* (N.J. 1963) 81 N.J. Super. 65 [194 A.2d 591, 595], affd. *Grand Union Co.* v. *Sills, supra,* 204 A.2d 853. See also *Schwartz* v. *Kelly, supra,* 140 Conn. 176, 180; *Supreme Malt Products Co., Inc.* v. *Alcoholic Beverage Control Com., supra,* 334 Mass. 59, 62.)

ing disruptions that we have described may be curtailed by present statutes. ■ But, in the first place, even assuming that the Legislature did no more than fashion further means of proscribing previously prohibited practices (Bus. & Prof. Code, §§ 25600-25666; *Id.*, §§ 17000-17101), we see no ground for unconstitutionality in such duplication. The possibility that "other less stringent . . . regulations might have sufficed is not our concern; that is a matter lying within the discretion of the legislative body." (*Natural Milk etc. Assn.* v. *City & County of San Francisco* (1942) 20 Cal.2d 101, 115 [124 P.2d 25].)[10]

In the second place, the Legislature may have intended more than the fortification of existing statutory regulations. It may have sought to fill the gap between price-cutting procedures pursued in practice and those proscribed by law. The Unfair Practices Act (Bus. & Prof. Code, §§ 17000-17101) does not offer a facile means for the prevention of all below cost and loss leader selling; the requirements of proof of such selling under the act are stringent and for this reason the act is rarely invoked.[11] The Legislature could certainly have concluded that such legislation would be of small comfort and little aid to independent retailers in their struggle against large-scale price-cutting competitors.

Whatever dangers the Legislature thought implicit in disorderly marketing, we cannot question the wisdom of its concern. As we said in another context, "Where the Legislature has determined that a defined condition or activity is a nuisance, it would be a usurpation of the legislative power for a court to arbitrarily deny enforcement merely because in its independent judgment the danger caused by a violation was not significant." (*City of Bakersfield* v. *Miller* (1966) 64 Cal.2d 93, 100 [48 Cal.Rptr. 889, 410 P.2d 393].)

Finally, plaintiff contends that the retail price maintenance provisions, even if reasonably related to either or both of their declared objectives, cannot be justified as an exercise of the police power because their "real" purpose and effect is not to

[10]The principle that even a legitimate governmental purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved" (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 81 S.Ct. 247]) has no application to a purely economic regulation, impinging in no significant way upon the dignity or freedom of the individual.

[11]See Note (1948) 57 Yale L.J. 391, 417.

regulate the sale of alcoholic beverages in the public interest but to swell the profits of the liquor industry.

Insofar as plaintiff's contention focuses on the legislative *purpose*, it amounts to a suggestion that we should not take the Legislature at its word but should instead decide for ourselves, by a process which remains unexplained, what the Legislature "really" intended to achieve by enacting the provisions in question. Although several courts have acceded to that suggestion,[12] we do not believe that we are either authorized or equipped to undertake so ill-defined and hazardous an inquiry. "[T]his court may not presume that in reaching its decision [the Legislature] acted upon improper motives. '. . . a judiciary must judge by results, not by the varied factors which may have determined legislators' votes . . .' [citations]." (*Werner* v. *Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, 129.) "Nor can legislation be set aside by courts because of the fact, if it be such, that it has been sponsored and promoted by those who advantage from it [footnote omitted]." (*Cohen* v. *Beneficial Loan Corp.* (1949) 337 U.S. 541, 551 [93 L.Ed. 1528, 69 S.Ct. 1221].)

Insofar as plaintiff's contention focuses on the legislative *effect*, we cannot fail to recognize it as an invitation to hold the law invalid because we disagree with its desirability. As we have said, we cannot invalidate legislation merely because we do not approve of its potentially beneficent impact upon a particular segment of society.

At its base, the argument that the statute is unconstitutional because of its supposed bias in favor of the liquor industry rests upon a wholly unrealistic view of the legislative process. As our social and economic life grows in complexity, legislation necessarily increases in the differentiation of its techniques and in the specialization of its objectives. Thus the endeavor to achieve the general welfare of the whole through the special welfare of each part becomes ever more necessary. By protecting the interests of complaining constituents through legislation tailored to meet their particular needs, the Legislature can seek to maximize the satisfaction of society as

---

[12]See, e.g., *Union Carbide & Carbon Corp.* v. *White River Distributors, Inc., supra,* 224 Ark. 558, 563; *Zale-Las Vegas, Inc.* v. *Bulova Watch Co., supra,* 396 P.2d 683, 689; *Skaggs Drug Center* v. *General Elec. Co., supra,* 63 N.M. 215, 226; *American Home Products Corp.* v. *Homsey, supra,* 361 P.2d 297, 302; *General Elec. Co.* v. *Wahle, supra,* 207 Ore. 302, 317, 322.

a whole. Surely courts should not inject themselves into this inherently pluralistic process of compromise by attempting to reserve to themselves a power to veto the balance struck because of a bare belief in its undesirability.

Plaintiff's second basic challenge to the constitutionality of the retail price maintenance provisions is that they unlawfully delegate legislative power by enabling each producer and wholesaler to set the price below which retailers may not sell his product. We rejected precisely that contention in *Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d 141, 149-152, just as we rejected a similar contention in sustaining the general Fair Trade Act (Bus. & Prof. Code, §§ 16900-16905) against a challenge of unlawful delegation in *Scovill Mfg. Co.* v. *Skaggs etc. Drug Stores, supra,* 45 Cal.2d 881, 888. We see no reason to depart from those holdings.

To contend that the Alcoholic Beverage Control Act unlawfully delegates legislative power is to misconceive the nature of the power which is purportedly delegated. The power we analyze here finds expression in the private act of the producer in entering into a contract setting a price for the resale of his own brand. *Scovill* tells us that this act is not the performance of a legislative function and not the exercise of an unlawfully delegated power. Nor does plaintiff directly question *Scovill.* Yet, if the producer's contractual designation of a resale price binding on all retailers is not the exercise of an unlawfully delegated legislative power, the statutory *requirement* that he designate that price cannot transform his act into the exercise of such a power. The statutory requirement clearly confers no *power* on the producer that he would not have possessed without it.

*Allied Properties* makes this point abundantly clear. In describing the alleged delegation, the opinion in *Allied Properties* states that "the function performed by the persons who assertedly exercise delegated legislative powers is the same under the general Fair Trade Act and the Alcoholic Beverage Control Act." (P. 149.) The opinion points out that the act of designating a resale price binding on all retailers is " 'no more legislative in character than are other acts . . . of private parties undertaken as a prerequisite to the application of a statute.' " (P. 149.)

To argue that the Alcoholic Beverage Control Act unlawfully delegates legislative power because it is a "price-fixing

act'' is to overlook the crucial distinction between the fixing of a price for *all* products in a given market and the setting by the producer of the retail price at which *his own* product is to be sold.[13] As *Allied Properties* explains (pp. 151-152), this distinction finds dramatic illustration in the difference between the instant legislation and the statute involved in *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, Inc.* (1953) 40 Cal.2d 436 [254 P.2d 29].

The court in *Thrift-D-Lux* declared unconstitutional a statute which delegated to the State Board of Dry Cleaners the power to fix minimum prices. (Bus. & Prof. Code, §§ 9560-9567, repealed by Stats. 1957, ch. 1691, § 11.) The statute entrusted the board with the power to decide, in terms of the public health and safety, which cities should have minimum price schedules, which services should be included in those schedules, and what prices should be charged for the services. As *Allied Properties* points out, the court in *Thrift-D-Lux,* in holding the statute unconstitutional, ''relied on the ground that there was a delegation of legislative power without ascertainable standards to an administrative board composed mainly of members of the industry who would participate in fixing prices to be charged by their competitors . . . . On the other hand it was held in *Scovill Mfg. Co.* v. *Skaggs etc. Drug Stores, supra,* 45 Cal.2d 881, 887-888, that there was no delegation of legislative power where manufacturers, acting in their private capacity under the general Fair Trade Act, fixed the prices for which their own products were to be sold at retail by persons who were not their competitors. The distinguishing factor is that the dry cleaners' board was directed to fix uniform minimum prices for the services of all dry cleaners in limited areas on the basis of what it believed was required by public health and safety, whereas under the general Fair Trade Act each manufacturer is to fix retail prices for his own products in accord with his personal interest.'' (*Allied*

[13]The Alcoholic Beverage Control Act delegates to the producer no power which he could not in theory achieve unilaterally. The producer could, subject of course to the antitrust laws (see, e.g., *Simpson* v. *Union Oil Co.* (1964) 377 U.S. 13 [12 L.Ed.2d 98, 84 S.Ct. 1051]), maintain his own retail outlets or place his goods on consignment and thereby reserve full control over their retail price without the aid of price maintenance legislation of any kind. The infeasibility of such vertical integration in the liquor industry should not be permitted to obscure the fact that the Legislature has simply attempted to simulate some of the marketing conditions which would prevail if vertical integration were to take place.

*Properties* v. *Department of Alcoholic Beverage Control,*
*supra,* 53 Cal.2d 141, 151-152.)

When the power which the Legislature purports to confer is
the power to regulate the business of one's competitors, as in
*Thrift-D-Lux,* or the power to exclude potential competitors
from an entire industry or occupation, as in *Blumenthal* v.
*Board of Medical Examiners* (1962) 57 Cal.2d 228, 235-236
[18 Cal.Rptr. 501, 368 P.2d 101], a real danger of abuse arises,
and the courts accordingly insist upon stringent standards to
contain and guide the exercise of the delegated power.[14]

A similar insistence upon stringent standards would serve
little if any purpose in the case of the Alcoholic Beverage
Control Act. As we noted in *Allied Properties* (pp. 151-152),
that act authorizes no individual or group to exercise either
regulatory or exclusionary power over any competitor, actual
or potential. The Legislature has not authorized anything
resembling "price-fixing" in the traditional, horizontal sense :
it has authorized no one to fix the price charged by a competi-
tor. Thus the Alcoholic Beverage Control Act does not create
the special danger threatened by a statute which delegates
*industry-wide* regulatory power to interested members of the
regulated industry.

To the extent that the retail price maintenance provi-
sions enable a producer to control the bargaining process
between those who sell and those who buy his own product, the
Legislature could reasonably assume that competition among
producers,[15] coupled with the bargaining power of those low-
overhead retailers who desire lower retail prices, would
provide a safeguard against excessive prices. In all proba-
bility, that safeguard is at least as effective as any which the

---

[14]In *Blumenthal,* for example, we treated the absence of suitable safe-
guards as a consideration reinforcing our conclusion that the statute in
question, giving licensed opticians virtually absolute power over those
required to serve under them in order to enter the profession, was so arbi-
trary as to deny equal protection of the laws. (P. 235.)

[15]At the time of the transactions in question, section 24755 of the
Business and Professions Code required, and section 24750 permitted,
retail price maintenance only as to brands which were "in fair and open
competition with alcoholic beverages of the same general class."
Although some commentators took the view that this limitation had little
practical effect (see, e.g., Herman, *Free and Open Competition* (1957)
9 Stan.L.Rev. 323, 327), the Legislature could reasonably have reached
a different conclusion. Moreover, apart from the "fair and open com-
petition" clause, the Legislature, as we said in *Allied Properties* (p. 148),
"could reasonably proceed on the theory that the public will be ade-
quately protected against excessive prices by the ordinary play of com-
petition between manufacturers."

Legislature could be expected to provide by promulgating explicit standards for the setting of retail prices, enforcible by an administrative or judicial agency.[16] To impose a requirement of expressed legislative standards would here reflect "little more than a judicial fetish for legislative language, the recitation of which [would provide] no additional safeguards to persons affected by the exercise of the delegated authority." (*Warren* v. *Marion County* (1960) 222 Ore. 307, 314 [353 P.2d 257]; see also 1 Davis, Administrative Law Treatise, § 2.15, pp. 148-151 and 1965 Supp., pp. 52-55; Jaffe, *Law Making by Private Groups* (1937) 51 Harv.L.Rev. 201, 248-251.)

In light of these observations, we find transparently erroneous the arguments that the statute unlawfully delegates "price-fixing" power because (1) the producer *must* set the price which will be observed in resale; (2) the law imposes an obligation upon all people in this state to observe that price; and (3) the violation of the act is a "public offense."

All three arguments ignore the basic difference between a statute requiring the unilateral designation by each producer of the resale price of his own product and a statute requiring the multilateral observance by all competitors of a fixed minimum price of a commodity. ■ That the private act of specifying a resale price is lifted by the statute beyond the contracting producer and retailer to a publicly enforced observance by all retailers within the state does not convert the legislation into a "price-fixing" statute, since the law still empowers no one to regulate the retail price of any commodity.

■ Although the Alcoholic Beverage Control Act *requires* (Bus. & Prof. Code, § 24755), whereas the Fair Trade Act merely *permits* (Bus. & Prof. Code, § 16902), producers and wholesalers to set retail prices, this mandatory aspect of the Alcoholic Beverage Control Act "does not render the function of a producer or wholesaler legislative in character but, to the contrary, decreases his discretion since he is not free to determine whether fair trading should occur. ■ While mandatory fair trading means that retailers cannot obtain merchandise free from price restrictions, this is due to the determination of the Legislature, not the action of the producers and wholesalers." (*Allied Properties* v. *Department of*

---

[16]The extraordinary difficulty of formulating meaningful price guidelines suggests that any legislative effort to do so here might well have proven *utterly* futile. (See, e.g., Fulda, *Resale Price Maintenance* (1954) 21 U.Chi.L.Rev. 175, 182 fn. 33.)

*Alcoholic Beverage Control, supra,* 53 Cal.2d 141, 150.) The mandatory feature of the act endangers none of the interests which the anti-delegation doctrine seeks to protect,[17] since it threatens neither the principle that truly fundamental issues should be resolved by the Legislature nor the precept that a grant of authority should be accompanied by safeguards adequate to prevent its abuse. Thus it provides no reason to hold that the act unconstitutionally delegates legislative power.

Similarly, the fact that the Alcoholic Beverage Control Act authorizes public enforcement in the form of administrative sanctions (Bus. & Prof. Code, § 24200) and criminal penalties (Bus. & Prof. Code, § 25617) does not furnish a basis for finding an unlawful delegation of legislative power. As we said in *Allied Properties,* "this aspect of the act does not involve any delegation of power, the sanctions being prescribed by the Legislature, not by the producers or wholesalers." (53 Cal.2d at p. 150.) A rule does not assume "a legislative character because the violation thereof is punished as a public offense." (*United States* v. *Grimaud* (1911) 220 U.S. 506, 521 [55 L.Ed. 563, 31 S.Ct. 480].) So long as the Legislature itself prescribes the terms of the sanctions and defines the circumstances in which they apply, their presence in a statute in no way undermines either the concern for legislative resolution of basic questions of policy or the concern for legislative restriction of the opportunity for abuse. Accordingly, the provision of public sanctions can hardly convert an otherwise constitutional grant of authority into an unconstitutional delegation of legislative power.

It follows, then, that we could not hold the retail price maintenance provisions unconstitutional on delegation grounds without overruling not only *Allied Properties* but also *Scovill,* with the result that the entire fair trade program of this state would be rendered unenforceable by judicial fiat. We are convinced that such an assertion of judicial power would gravely misplace the locus of responsibility in our form of government. We therefore hold the retail price maintenance provisions of the Alcoholic Beverage Control Act constitutional.

2. *Applicability of section 24755.1*

As a second basic proposition, plaintiff urges us to reverse the judgments on the ground that section 24755.1 of the Busi-

---

[17]See generally Jaffe, *An Essay on Delegation of Legislative Power* (1947) 47 Colum.L.Rev. 359, 561.

ness and Professions Code precludes the imposition of the penalties of license suspension and revocation rendered in the instant cases. ▮▮▮ But, as we point out in more detail hereinafter, the general assumption that a legislative change does not operate retroactively applies with special force in the instant situation in which the Legislature has altered the method of enforcement of the statute. Secondly, and independently, any attempt to give the statute retroactive effect would require us to resolve the constitutional issue whether we could thus impose potentially more severe penalties than those provided by the prior statute; we should not espouse an interpretation which invites constitutional difficulties.

Prior to the enactment of section 24755.1 (Stats. 1965, ch. 742, § 1; effective September 17, 1965), violation of the retail price maintenance provisions of the Alcoholic Beverage Control Act subjected the transgressor not only to the discretionary suspension or revocation of his license (Bus. & Prof. Code, § 24200) but also to punishment as a misdemeanant by a fine of not more than $500 and/or a county jail term of not more than six months (Bus. & Prof. Code, § 25617). By enacting section 24755.1 the Legislature replaced this method of enforcement with a system of mandatory fines leviable by the Department of Alcoholic Beverage Control in the amount of $250 for the first illegal sale and $1,000 for each subsequent such sale in any three-year period. Pending any appeal from the imposition of a fine, the new section required a licensee to pay under protest a fine, which was recoverable with interest if the appeal succeeded, or to execute a surety bond in the amount of the fine. The failure to perform either undertaking within 30 days provoked an automatic suspension of the license pending performance.

Article XX, section 22, of the California Constitution empowers the Department of Alcoholic Beverage Control "in its discretion" to "deny, suspend or revoke any specific alcoholic beverage license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, . . ." At the same time, section 22 empowers the Legislature to "provide for the issuance of all types of [alcoholic beverage] licenses" and gives to the Department of Alcoholic Beverage Control "the exclusive power . . . *in accordance with laws enacted by the Legislature*, to license the . . . sale of alcoholic beverages. . . ." (Italics added.)

If we were to hold section 24755.1 applicable to the judgments here on appeal, we would be compelled to decide, first, whether that section constitutes an invalid *limitation* upon the power vested in the department by article XX insofar as it eliminates the department's discretionary power to suspend or revoke a license for violation of the retail price maintenance provisions; and, second, whether that section constitutes an invalid *extension* of the power vested in the department by article XX insofar as it adds the power to impose mandatory fines for violation of the retail price maintenance provisions.[18] ■■■ We reach neither of these two constitutional questions, however, since we hold that section 24755.1 does not apply to any of the four judgments here on appeal.

■■■ We begin with the general presumption that legislative changes do not apply retroactively unless the Legislature expresses its intention that they should do so. Three of our basic codes provide that no part thereof is retroactive "unless expressly so declared" (Civ. Code, § 3; Code Civ. Proc., § 3; Pen. Code, § 3); we have held that this language does no more than codify a general rule of construction, applicable as well to statutes containing no such provision. (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 172-173 [18 Cal.Rptr. 369, 367 P.2d 865]; see generally, *State of California* v. *Industrial Acc. Com.* (1957) 48 Cal.2d 355 [310 P.2d 1], and *Aetna Cas. & Surety Co.* v. *Industrial Acc. Com.* (1947) 30 Cal.2d 388 [182 P.2d 159].)

This presumption of nonretroactivity rests in part upon the fact that the purpose of a legislative alteration would not often attain significant advancement by application of the amended legislation to transactions which preceded the legislative change. Of course the legislative purpose may on occasion entail retroactive as well as prospective implications. Thus, for example, when the Legislature not only abolishes a penalty or forfeiture but also repeals the underlying duty which the penalty had been designed to enforce, no purpose would be served by imposing the penalty in a case still pending on appeal on the date of abolition. In such a case, therefore, we have given retroactive effect to the abolition

---

[18]No fines are directly involved in these proceedings, but the provisions of section 24755.1 are clearly inseverable, and if we were to decide that article XX invalidates the provision requiring the department to impose fines, then we should be compelled to conclude, as a matter of legislative interpretation, that all of section 24755.1, including its prohibition against license suspension or revocation, is inoperative.

notwithstanding the Legislature's silence on the matter. (*People* v. *One 1953 Buick* (1962) 57 Cal.2d 358, 364 [19 Cal.Rptr. 488, 369 P.2d 16].) In particular, if the Legislature abolishes a penalty in order to encourage conduct formerly prohibited, public policy may dictate abatement of pending actions designed to exact the penalty. (See, e.g., *Hamm* v. *Rock Hill* (1964) 379 U.S. 306 [13 L.Ed.2d 300, 85 S.Ct. 384], and *Blow* v. *North Carolina* (1965) 379 U.S. 684 [13 L.Ed.2d 603, 85 S.Ct. 635].) Even if the Legislature retains the underlying duty but simply abolishes or mitigates the penalty fixed for its violation, we may properly say that the Legislature has "expressly determined that its former penalty was too severe and that a lighter punishment is proper." (*In re Estrada* (1965) 63 Cal.2d 740, 745 [48 Cal.Rptr. 172, 408 P.2d 948].) In such a case, to hold that the new, lighter penalty now deemed sufficient should not apply to a case still pending on appeal "would be to conclude that the Legislature was motivated by a desire for vengeance." (*Ibid.*)

The Legislature's alteration of the method for enforcement of a statute, however, ordinarily reflects its decision that the revised method will work greater future deterrence and achieve greater administrative efficiency. Yet the design for efficacy of deterrence and efficiency of administration hardly affects the case which has already reached a final administrative decision based upon the old procedure.[19]

The enactment of section 24755.1 constitutes just such an attempted improvement in the machinery of enforcement. The Legislature determined that the imposition of mandatory fines, which become immediately payable despite appeal or mandate, would prove more effective in enforcing the statute than criminal prosecution, or discretionary suspension and revocation of licenses, which often involve substantial procedural delays. (See, e.g., the stay provisions of Code Civ. Proc., § 1094.5, subd. (f).)

Whatever advantages the Legislature may have contemplated by the new procedure, such benefits could not inure in the instant litigation. However cumbersome or slow the old

---

[19]To the extent that the Legislature intended to create a more effective deterrent, we find little reason to apply the new method of enforcement to a transaction occurring before its enactment. To the extent that the Legislature intended to reduce the cost or the delay involved in invoking the old enforcement mechanism, we can see some reason to apply the new method to a transaction preceding its enactment, but none if, prior to enactment, that transaction had already triggered the imposition of penalties under the old enforcement machinery.

machinery may have been, it has done its work. To undo it now and begin anew with the more streamlined mechanism would not fulfill the legislative design. Indeed, the legislative purpose would be served better by a decision which terminates this litigation than by a remand for further proceedings on charges which, in some instances, have extended over a decade.

The incongruity of remanded proceedings in this case becomes even clearer in light of the prospective functioning of part of the amended statute. An integral segment of the new enforcement system is the provision of section 24755.1 requiring prompt payment or execution of a surety bond pending appeal. That central provision is *necessarily* prospective in operation. Section 24755.1 clearly does not apply to a license suspension or revocation preceding its effective date.

 A second and alternative reason for holding that section 24755.1 operates only prospectively lies in the fact that the contrary interpretation raises possible constitutional objections in view of the prohibition against ex post facto punishment (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 16). In the instant case we deal with a statute which imposes penalties potentially more severe than those authorized by the prior law. The maximum fine that could have been levied on plaintiff under the previous statute was $500 *per conviction*, whereas the amount that *must* be imposed under the new law is $1,000 *per sale* after the first sale in any three-year period.[20] Although, conceivably, the Constitution might not prohibit the Legislature from giving retroactive effect to these increased monetary penalties, the matter is not free from doubt.[21] We are reluctant to thrust upon the Legislature a constitutionally suspect choice when its silence is at least as compatible with a construction subject to no such potential infirmity.[22]

---

[20]The licensee may of course avoid paying the higher fine by accepting the alternative of indefinite suspension of the license for failure to pay, an alternative no more burdensome than the revocation imposed under the prior law.

[21]We note that this consideration applies to all transactions preceding the effective date of the new enactment, whether or not proceedings under the prior law had been terminated, or even commenced, prior to that date.

[22]Even in civil cases, we have carefully avoided the retroactive imposition of increased liabilities. (See *Estate of Skinker* (1956) 47 Cal.2d 290, 297-298 [303 P.2d 745, 62 A.L.R.2d 1137]; see also *Helm* v. *Bollman* (1959) 176 Cal.App.2d 838, 841-842 [1 Cal.Rptr. 723].) Significantly, none of our cases giving retroactive effect to the abrogation or reduction

Although arguably the revised statute provides penalties in some respects more, and in others less, severe than those previously imposed, we cannot sever the less onerous provisions and give retroactive effect to them alone in order to avoid the constitutional issue; such legal surgery would clearly violate the legislative compromise reflected in the statute. Finding just such an obstacle in *In re Griffin* (1965) 63 Cal.2d 757 [48 Cal.Rptr. 183, 408 P.2d 959], we refused to give retroactive effect to any part of a statute which reduced the minimum sentence for selling marijuana while postponing eligibility for parole. As applied to the petitioner in *Griffin*, the new law, considered as a whole, operated more harshly and hence could not constitutionally be given retroactive effect. Having been relieved of the burdens imposed by the new law, petitioner could not avail himself of its benefits. (*Id.* at p. 761.)

Accordingly, we hold that, in the instant case, absent a contrary expression of legislative intent, a decrease in penalties which is not readily severable from an accompanying increase will be given prospective effect only. The provision in section 24755.1 which abrogates the penalties of discretionary license suspension and revocation thus does not apply to the present case, since all of the violations in question preceded the effective date of that section.

### 3. *Procedural and evidentiary grounds for reversal*

We set forth, finally, our reasons for rejecting plaintiff's third basic proposition: that procedural errors invalidated the judgments in that (1) the evidence at the administrative proceedings failed to show that the beverages involved in the accusations against plaintiff were in fair and open competition; (2) the trial court erroneously prevented plaintiff from adducing evidence of unfair competition submitted to the court by the affidavit filed with plaintiff's motion for a new trial; and (3) the evidence before the department did not support the finding that the retail prices had been properly published.

As to plaintiff's first contention, we note that the department submitted evidence that all of the brands set forth in the accusations were "in fair and open competition with

of civil penalties has involved the substitution of other, perhaps more severe, penalties. (See, e.g., *People* v. *One 1953 Buick, supra,* 57 Cal.2d 358; *Meriwether Inv. Co.* v. *Lampton* (1935) 4 Cal.2d 697, 707-708 [53 P.2d 147]; *Anderson* v. *Byrnes* (1898) 122 Cal. 272, 274 [54 P. 821].)

alcoholic beverages of the same general class produced by others'' (Bus. & Prof. Code, § 24750). In the proceedings which resulted in the first three judgments, plaintiff offered no evidence to rebut this showing. It now seeks to explain its omission on the ground that such proceedings all occurred prior to the decision in *DeMartini* v. *Department of Alcoholic Beverage Control* (1963) 215 Cal.App.2d 787 [30 Cal.Rptr. 668]. The *DeMartini* decision, however, did not change the law; plaintiff in each of the proceedings in question was clearly entitled to produce evidence to rebut that offered by the department. Since it did not do so, we cannot uphold its contention.

In the proceedings involved in the fourth judgment, plaintiff did attempt, without success, to overcome the department's evidence of fair and open competition; plaintiff now complains of four rulings which supposedly curtailed that attempt.

 First, plaintiff argues that the hearing officer improperly quashed a subpoena duces tecum by which plaintiff sought to compel the production of certain documents possessed by the department. The officer quashed the subpoena in its entirety only with respect to brands of alcoholic beverages set forth in those counts of the accusations which were subsequently dismissed, thereby rendering moot the validity of this portion of the ruling. Regarding matters pertinent to the other counts of the accusations against plaintiff, the officer granted the motion to quash only with respect to certain records of departmental investigations which had not resulted in any official action.

We need not decide whether the involved records contained "communications made [to a public officer] in official confidence" and thus became privileged (Code Civ. Proc., § 1881, subd. 5; *Chronicle Publishing Co.* v. *Superior Court* (1960) 54 Cal.2d 548, 566 [7 Cal.Rptr. 109, 354 P.2d 637]), since we hold that the ruling did not effect such prejudice as to require reversal. The matters in question were relevant, at best, to the possibility that persons other than plaintiff might have engaged in certain unfair trade practices. Even if plaintiff had shown that others were guilty of such illegal conduct, the record would still have amply supported the conclusion that "there are on the market commodities produced by others which are so similar in character . . . that they provide competition which is not hampered by unlawful trade

restraints." (*Scovill Mfg. Co.* v. *Skaggs etc. Drug Stores, supra,* 45 Cal.2d 881, 889; see also *DeMartini* v. *Department of Alcoholic Beverage Control, supra,* 215 Cal.App.2d 787, 807-808.)

Second, plaintiff argues that the hearing officer improperly refused to permit the examination of a witness as to. his knowledge of secret rebates which allegedly encouraged unfair competition by retailers. To the extent that the testimony would not have been hearsay, as well as merely cumulative of documentary evidence already subpoenaed by plaintiff, it would, at best, have yielded evidence which plaintiff had unsuccessfully sought to obtain by subpoena. Having properly quashed the subpoena, the officer acted within his discretion in preventing plaintiff's effort to circumvent the prior ruling.

Third, plaintiff argues that the hearing officer improperly refused to grant a continuance in order that plaintiff might obtain copies of press releases issued by the director of the department in connection with disciplinary action taken against various licensees. Since plaintiff moved for the continuance one year after the date of the filing of the accusations and six months after the commencement of the hearings, and since nothing indicates that the press releases would have disclosed any evidence that plaintiff had not already obtained by its subpoena, we find no abuse of discretion in the ruling of the hearing officer.

Fourth, plaintiff argues that the hearing officer erroneously excluded an article from a trade journal containing excerpts from a speech which allegedly referred to unfair practices in the sale of unspecified brands of alcoholic beverages. Although relevant hearsay evidence may be admitted at an administrative hearing if it is the kind of statement upon which "responsible persons are accustomed to rely in the conduct of serious affairs" (Gov. Code, § 11513, subd. (c); *Mast* v. *State Board of Optometry* (1956) 139 Cal.App.2d 78, 85 [293 P.2d 148]), the speech in question attained neither the relevance nor the character required by the rule. Moreover, such evidence could have furnished no more than slight corroboration for the documentary evidence already obtained by subpoena. Accordingly, the hearing officer did not abuse his discretion by excluding the article.

Plaintiff's second procedural contention is that the trial court erroneously prevented it from producing additional evidence of unfair-competition, which it brought to the attention. of the court by an affidavit filed with its motion for new

trial. Yet in a mandate proceeding under section 1094.5 of the Code of Civil Procedure, the recognized rule precludes the introduction of evidence which the proponent neglected to offer before the administrative agency. (*Housman* v. *Board of Medical Examiners* (1948) 84 Cal.App.2d 308, 312-313 [190 P.2d 653, 192 P.2d 45].)

Plaintiff's third and final procedural contention is that the evidence before the department failed to support the finding that the retail prices of alcoholic beverages involved in the accusations had been properly published. Even if this contention had been seasonably advanced,[23] we would doubt its validity.

At the time plaintiff committed the acts involved in the various accusations, section 24755 of the Business and Professions Code contained no requirement of publication and rule 99 called only for publication "in a trade journal or industry price book." (Cal. Admin. Code, tit. 4, § 99, subd. (d).) In 1961 the Legislature amended section 24755 to provide that any person filing a minimum retail price schedule should "cause such schedule to be published in a manner which will result in each retailer affected by such schedule being advised of the contents of such schedule prior to the effective date thereof." (Stats. 1961, ch. 635, § 4.) Rule 99, as repromulgated in 1961, has continued to require publication in a trade journal of general circulation in the trading areas affected. (Cal.Admin. Code, tit. 4, § 99, subd. (k).) Plaintiff concedes that all of the above requirements have been met.

 Government Code section 6040, upon which plaintiff predicates its argument that the prices must be published in a "newspaper of general circulation," does not apply to this case; that section operates only when the matter in question "is required by law to be published in a newspaper"; no such requirement existed at any time relevant to the instant proceedings. Nor do we find any basis for plaintiff's remaining argument that the person filing the minimum retail price schedule must publish it personally and must keep it current.

Having concluded for the reasons set out above that the

---

[23]Since plaintiff failed to raise this issue before either the department or the appeals board, we would be justified in completely disregarding it at this late date. (See *Harris* v. *Alcoholic Beverage Control Appeals Board* (1961) 197 Cal.App.2d 182, 187 [17 Cal.Rptr. 167]; *Bohn* v. *Watson* (1954) 130 Cal.App.2d 24, 37 [278 P.2d 454].)

retail price maintenance provisions possess no constitutional infirmity, that section 24755.1 does not apply to the present case, and that plaintiff's evidentiary and procedural objections cannot stand, we must affirm the judgments.

The judgments are affirmed.

Traynor, C. J., Peek, J., Mosk, J., and Burke, J., concurred.

PETERS, J.—I dissent.

The constitutionality of the price provisions of the Alcoholic Beverage Control Act, commonly known as the liquor fair trade law, is the basic question here involved. In 1959, in *Allied Properties* v. *Department of Alcoholic Beverage Control*, 53 Cal.2d 141 [346 P.2d 737], the constitutionality of the statute was upheld in a 4-to-3 decision. In June of this year this court decided to reconsider that decision. Upon such reconsideration the majority have reaffirmed *Allied Properties, supra*. I dissented in 1959 and I dissent now.

The issues in 1959 were whether the statute accomplished its avowed purpose under the police power, and whether it involved an illegal delegation of legislative power. The issues are the same now. The majority in the instant case adopt the same faulty reasoning and come to the same erroneous conclusions as did the 1959 majority, and on the same grounds. The majority opinion here involved, although couched in different language than the 1959 opinion, adds nothing significant to a discussion of the constitutional principles involved. Its greatest deficiency is its failure to give significance to the decisions in other states, and to writings by legal scholars since 1959. As will be later pointed out, such decisions and writings[1] demonstrate a definite national trend, both in the field of liquor price regulation and in fair trade cases generally, to hold such statutes unconstitutional. This trend should not be so lightly disregarded.

In my opinion, as a matter of law, the liquor fair trade law is violative of due process in that it is designed to accomplish a purpose diametrically opposed to its avowed purpose and is not justified under the police power, and involves an illegal delegation of legislative power. These conclusions are as sound now as when I expressed them in my dissent in 1959, and are now supported by the definite weight of authority.

[1]See discussion in footnotes 3 and 4, *infra*.

That the statute, as a matter of law, is intended and designed to accomplish a purpose contrary to its avowed purpose and is not justified under the police power is demonstrated by an examination of the pertinent constitutional and statutory provisions.

The Department of Alcoholic Beverage Control was created by section 22 of article XX of the Constitution. The fifth paragraph of that section provides in part that the department "shall have the exclusive power, except as herein provided and in accordance with laws enacted by the Legislature, to license the manufacture, importation and sale of alcoholic beverages in this State, and to collect license fees or occupation taxes on account thereof. The department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverage license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, or that a person seeking or holding a license has violated any law prohibiting conduct involving moral turpitude." The section declares that its provisions are self-executing but that nothing therein shall prohibit the Legislature from enacting laws implementing and not inconsistent with such provisions.

The liquor fair trade law is a part of the Alcoholic Beverage Control Act, which was adopted "for the protection of the safety, welfare, health, peace, and morals of the people of the State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages." (Bus. & Prof. Code, § 23001.) Section 24749 of the Business and Professions Code adopted in 1961 states the purpose of the liquor fair trade law even more specifically: "It is the declared policy of the State that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages within this State for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate price wars which unduly stimulate the sale and consumption of alcoholic beverages and disrupt the orderly sale and distribution thereof, it is hereby declared as the policy of this State that the sale of alcoholic beverages should be subjected to certain restrictions and regulations."

The liquor fair trade law, unlike the general fair trade statutes, is mandatory and operates as follows. Section 24750 of the Business and Professions Code authorizes fair trade

contracts prohibiting the buyer from reselling, except at the price stipulated by the seller, alcoholic beverages which bear the trade-mark, brand, or name of the producer or owner and are in fair and open competition with others of the same general class. Willfully and knowingly advertising, offering for sale, or selling any alcoholic beverage at less than the price stipulated in any such contract, whether the person so advertising, offering for sale, or selling is or is not a party to the contract, is declared to be unfair competition and is actionable at the suit of any person damaged thereby. (Bus. & Prof. Code, § 24752.) Section 24755 of the Business and Professions Code, as it read at the time of the transactions under consideration, required that all distilled spirits sold at retail be sold pursuant to a contract executed under the above provisions and prohibited the violation of such contracts by licensees.

The department is authorized to adopt such rules as it determines to be necessary for the administration of the above provisions (Bus. & Prof. Code, § 24757), and rule 99 adopted by the department at that time provided in part that no manufacturer or wholesaler shall sell distilled spirits except pursuant to a fair trade contract as provided for by sections 24750 and 24755, that copies of such fair trade contracts shall be filed with the department, and that no licensee shall advertise or offer for sale alcoholic beverages at retail at a price less than the minimum resale price provided for by a fair trade contract filed with the department pursuant to this rule. (Cal. Admin. Code, tit. 4, § 99, subds. (a), (b), (f).)

The Legislature has enumerated the following as grounds for the suspension or revocation of licenses: (1) when the continuance of a license would be contrary to public welfare or morals, but proceedings under this statutory ground are not a limitation upon the department's authority to proceed under section 22 of article XX of the Constitution; (2) the violation by a licensee of any rules of the department adopted pursuant to the Alcoholic Beverage Control Act; (3) the violation of any penal provisions of law prohibiting or regulating the sale of alcoholic beverages. (Bus. & Prof. Code, § 24200.)

· Section 25617 of the Business and Professions Code provides that the violation of any of the provisions of the Alcoholic Beverage Control Act for which another penalty or punishment is not specifically provided for in the act is a misdemeanor punishable by a fine of not more than $500 or by imprisonment in the county jail for not more than six months, or both, and the section has been held to apply to violations of

the liquor fair trade provisions. (*Peck's Liquors, Inc.* v. *Superior Court*, 221 Cal.App.2d 772 [34 Cal.Rptr. 735].)

Thus, the fair trade provisions of the Alcoholic Beverage Control Act, together with the disciplinary power given the Department of Alcoholic Beverage Control directly by the Constitution, comprise a mandatory price-fixing system whereby the producers or wholesalers of branded or trademarked alcoholic beverages fix the retail prices of those beverages, and adherence to the prices is guaranteed by threat of imposition by the state of civil and criminal sanctions upon noncomplying retailers. The law operates to require the producer or distributor of a branded or trade-marked alcoholic beverage that is in fair and open competition with others of the same general class to enter into a contract with a retailer establishing a retail price before making any sales within the state. Thereafter, all retailers, whether or not parties to the contract, are required to adhere to that price under threat of a civil suit by the producer or distributor, suspension or revocation of their license by the Department of Alcoholic Beverage Control, and possible criminal penalties.[2] (See Cal.Const., art. XX, § 22; Bus. & Prof. Code, §§ 24750-24757, 25617; Cal. Admin. Code, tit. 4, § 99.)

The liquor fair trade law is to be distinguished from the general Fair Trade Act applicable to all branded or trademarked commodities sold at retail which are in free and open competition with others of the same general class. This general act was adopted in the depression and is similar to the Fair Trade Acts adopted during that period by a number of other states. (Stats. 1931, ch. 278, § 5, p. 583, now Bus. & Prof. Code, §§ 16900-16905; see 19 Ohio St.L.J. 748.) The primary objective of these acts has been regarded as the protection of

---

[2]In 1961 the fair trade provisions of the Alcoholic Beverage Control Act were changed in at least two important respects. Fair trade requirements were no longer limited to alcoholic beverages which are in fair and open competition with others of the same general class, and the minimum resale prices are now established by the filing of price schedules with the department as well as by contracts specifying the price at which the buyer may resell the beverages. (Stats. 1961, ch. 635, § 4.) Although the violation of such contract still gives rise to a private right of action by any person damaged thereby, section 24755 as it now stands prohibits sales of distilled spirits at less than the price filed with the department rather than at other than the price stipulated in the fair trade contract. (Bus. & Prof. Code, § 24755, as amended by Stats. 1961, ch. 635, § 4.)

These changes do not affect the instant case since they became effective on September 15, 1961, after the transactions and administrative decisions which are the subject of the present action. (*DiGenova* v. *State Board of Education*, 57 Cal.2d 167 [18 Cal.Rptr. 369, 367 P.2d 865].)

the producer's goodwill or property interest in his brand or trade-mark (*Old Dearborn etc. Co.* v. *Seagram etc. Corp.*, 299 U.S. 183, 193 [81 L.Ed. 109, 57 S.Ct. 139, 106 A.L.R. 1476]; *Max Factor & Co.* v. *Kunsman*, 5 Cal.2d 446, 455-463 [55 P.2d 177]), whereas the asserted purpose of the liquor fair trade law is to promote temperance in the consumption of alcoholic beverages (Bus. & Prof. Code, §§ 23001, 24749). The general act is permissive rather than mandatory; only a small portion of all commodities sold at retail are fair-traded. (See Fulda, *Resale Price Maintenance,* 21 U.Chi.L.Rev. 175, 179.) It is enforced only by private suits, not by criminal penalties or revocation or suspension of licenses by an administrative body.

This court has upheld the California Fair Trade Act against attacks on grounds of violation of due process (*Max Factor & Co.* v. *Kunsman, supra,* 5 Cal.2d 446) and unlawful delegation of legislative power (*Scovill Mfg. Co.* v. *Skaggs etc. Drug Stores,* 45 Cal.2d 881 [291 P.2d 936]). Although the Fair Trade Acts have recently been the subject of criticism by several legal scholars,[3] and the trend of authority in other states has shifted toward holding the acts unconstitutional,[4]

---

[3]The criticism has been leveled mainly at the view expressed by the United States Supreme Court in *Old Dearborn etc. Co.* v. *Seagram etc. Corp., supra,* 299 U.S. 183, and by this court in *Max Factor, supra,* that the purpose of fair trade is to protect the producer's goodwill. Pressure for the passage of Fair Trade Acts, it is pointed out, came not from producers, but from distributor and retailer organizations. Writers suggest that the real purpose of fair trade is to assure artificially high profits to retailers by eliminating competition at the retail level and that legislation designed to benefit one economic interest group at the expense of the consuming public is contrary to public policy. (See, e.g., Fulda, *Resale Price Maintenance, supra,* 21 U.Chi.L.Rev. 175; Shulman, *The Fair Trade Acts,* 49 Yale L.J. 607; 69 Yale L.J. 168; 15 Stan.L.Rev. 309; 63 Dick.L.Rev. 107.)

[4]In 1955 when this court dealt with the constitutionality of our general Fair Trade Act in *Scovill, supra,* the Fair Trade Acts of only 19 states other than our own had been tested in the state courts of last resort although fair trade laws then existed in 44 states. The *Scovill* decision listed 14 of those 19 states as upholding the constitutionality of their acts while in only 5 states were the acts held to be unconstitutional.

At present, 45 states other than our own have adopted fair trade laws and the laws have been tested in the courts of last resort in all states but 4. The 5 states which had held their laws unconstitutional at the time of *Scovill* have not changed their position. Of the 14 which had upheld the validity of their fair trade laws, Oregon, Washington, Pennsylvania, and Louisiana have reversed their position. Of the 22 states which have considered the constitutionality of their fair trade laws for the first time since *Scovill,* more than 2-to-1 have decided against constitutionality.

At present, 24 states have held their fair trade laws unconstitutional. (*General Elec. Co.* v. *Wahle,* 207 Ore. 302 [296 P.2d 635]; *Remington Arms Co.* v. *Skaggs,* 55 Wn.2d 1 [345 P.2d 1085]; *Olin Mathieson*

the differences in both purpose and operation between the mandatory liquor price-fixing act and our general Fair Trade Act require that they be analyzed separately and show that the validity of one is not dependent upon the constitutionality of the other.

The majority in *Allied Properties* (*supra*, 53 Cal.2d 141), and the majority here, conclude that the liquor fair trade law is a proper exercise of the police power. The requirement that alcoholic beverages be sold pursuant to fair trade contracts is regarded as bearing a reasonable relation to the valid objectives of promoting orderly marketing conditions and promot-

*Chemical Corp.* v. *White Cross Stores, Inc.*, 414 Pa. 95 [199 A.2d 266]; *Dr. G. H. Tichenor etc. Co.* v. *Schwegmann Bros. etc. Markets*, 231 La. 51 [90 So.2d 343, 60 A.L.R.2d 410]; *Liquor Store, Inc.* v. *Continental Distilling Corp.* (Fla.) 40 So.2d 371; *Grayson-Robinson Stores* v. *Oneida, Ltd.*, 209 Ga. 613 [75 S.E.2d 161]; *Shakespeare Co.* v. *Lippman's etc. Sporting Goods Co.*, 334 Mich. 109 [54 N.W.2d 268]; *McGraw Elec. Co.* v. *Lewis & Smith Drug Co.*, 159 Neb. 703 [68 N.W.2d 608]; *Union Carbide & Carbon Corp.* v. *White River Distributors, Inc.*, 224 Ark. 558 [275 S.W.2d 455]; *Rogers-Kent, Inc.* v. *General Elec. Co.*, 231 S.C. 636 [99 S.E.2d 665]; *General Elec. Co.* v. *American Buyers Coop.* (Ky.) 316 S.W.2d 354; *Bissell Carpet Sweeper Co.* v. *Shane Co.*, 237 Ind. 188 [143 N.E.2d 415]; *Remington Arms Co.* v. *G.E.M. Inc.*, 257 Minn. 562 [102 N.W.2d 528]; *Bulova Watch Co.* v. *Zale Jewelry Co.* (Wyo.) 371 P.2d 409; *Quality Oil Co.* v. *E. I. Du Pont De Nemours & Co.*, 182 Kan. 488 [322 P.2d 731]; *General Elec. Co.* v. *Thrifty Sales*, 5 Utah 2d 326 [301 P.2d 741]; *Union Carbide & Carbon Corp.* v. *Skaggs Drug Center, Inc.*, 139 Mont. 15 [359 P.2d 644]; *American Home Products Corp.* v. *Homsey* (Okla.) 361 P.2d 297; *Bulova Watch Co.* v. *Robinson Wholesale Co.*, 252 Iowa 740 [108 N.W.2d 365]; *Skaggs Drug Center* v. *General Elec. Co.*, 63 N.M. 215 [315 P.2d 967]; *Olin Mathieson Chemical Corp.* v. *Francis*, 134 Colo. 160 [301 P.2d 139]; *General Elec. Co.* v. *A. Dandy Appliance Co.*, 143 W.Va. 491 [103 S.E.2d 310] *Zale-Las Vegas, Inc.* v. *Bulova Watch Co.*, 80 Nev. 483 [396 P.2d 683]; *Bulova Watch Co.* v. *Zale Jewelry Co.*, 274 Ala. 270 [147 So.2d 797].)

Seventeen states other than our own have held their fair trade laws constitutional. (*Burroughs Wellcome & Co.* v. *Johnson Wholesale Perfume Co.*, 128 Conn. 596 [24 A.2d 841]; *Klein* v. *National Pressure Cooker Co.*, 31 Del. Ch. 459 [64 A.2d 529]; *Goldsmith* v. *Mead Johnson & Co.*, 176 Md. 682 [7 A.2d 176]; *W. A. Sheaffer Pen Co.* v. *Barrett*, 209 Miss. 1 [45 So.2d 838]; *General Electric Co.* v. *Packard Bamberger & Co., Inc.*, 14 N.J. 209 [102 A.2d 18]; *Bourjois Sales Corp.* v. *Dorfman*, 273 N.Y. 167 [7 N.E.2d 30, 110 A.L.R. 1411]; *Eli Lilly & Co.* v. *Saunders*, 216 N.C. 163 [4 S.E.2d 528, 125 A.L.R. 1308]; *Miles Laboratories, Inc.* v. *Owl Drug Co.*, 67 S.D. 523 [295 N.W. 292]; *Frankfort Distillers Corp.* v. *Liberto*, 190 Tenn. 478 [230 S.W.2d 971]; *Weco Products Co.* v. *Reed Drug Co.*, 225 Wisc. 474 [274 N.W. 426]; *Hudson Distributors, Inc.* v. *Upjohn Co.*, 174 Ohio 487 [190 N.E.2d 460]; *General Elec. Co.* v. *Kimball Jewelers*, 333 Mass. 665 [132 N.E.2d 652]; *Kinsey Distilling Sales Co.* v. *Foremost Liquor Stores*, 15 Ill.2d 182 [154 N.E.2d 290]; *Standard Drug Co.* v. *General Elec. Co.*, 202 Va. 367 [117 S.E.2d 289]; *United States Time Corp.* v. *Ann & Hope Factory Outlet* (R.I.) 205 A.2d 125; *General Elec. Co.* v. *Telco Supply Inc.*, 84 Ariz. 132 [325 P.2d 394]; *Corning Glass Works* v. *Max Dichter Co.*, 102 N.H. 505 [161 A.2d 569].)

ing temperance since it prevents retail price-cutting and bargain sales by eliminating price competition at the retail level. It is reasoned that, as in the case of the general Fair Trade Act, there is no delegation of legislative power because the price determinations made by producers and wholesalers are contractual and not legislative in character; they are "merely 'the facts in contemplation of which the Legislature acted, and upon the existence of which the provisions of the enactment were to be applicable.'" (*Allied Properties* v. *Department of Alcoholic Beverage Control, supra,* 53 Cal.2d 141, 151.) The majority see no significant difference with regard to delegation between the general Fair Trade Act and the liquor fair trade law. The mandatory nature of the latter is viewed as restricting rather than increasing the authority of the price setter, and the additional sanctions available in the enforcement of the liquor fair trade law are not regarded as affecting delegation on the theory that they are prescribed by the Legislature and not by the producers or wholesalers.

These arguments, in my opinion, are unsound. It is the general rule that in determining whether legislation is a valid exercise of the police power, the inquiry of the court is limited to determining whether the object of the statute is one for which the police power may legitimately be invoked and, if so, whether the statute bears a reasonable and substantial relation to the object sought to be obtained. (*Wholesale Tobacco Dealers* v. *National etc. Co.,* 11 Cal.2d 634, 643 [82 P.2d 3, 118 A.L.R. 486].) It is, of course, not the province of the judiciary to question the wisdom of economic policy as long as it may reasonably be deemed to promote the public welfare, and if the statute has a reasonable relation to a proper legislative purpose, and is neither arbitrary nor discriminatory, the requirements of due process are satisfied. (*Nebbia* v. *New York,* 291 U.S. 502, 537 [78 L.Ed. 940, 54 S.Ct. 505, 89 A.L.R. 1469]; *Max Factor & Co.* v. *Kunsman, supra,* 5 Cal.2d 446, 456.) When, however, the statute bears no reasonable relation to the legislative purpose, it is invalid. (*Blumenthal* v. *Board of Medical Examiners,* 57 Cal.2d 228, 233 [18 Cal.Rptr. 501, 368 P.2d 101].)

There can be no doubt at all that the promotion of temperance in the consumption of alcoholic beverages is a proper subject of state regulation. The state has wide powers with respect to the regulation of traffic in alcoholic beverages and can prohibit their production and sale altogether. (*Ziffrin* v. *Reeves,* 308 U.S. 132, 138-139 [84 L.Ed. 128, 60 S.Ct. 163]; cf.

*Sandelin* v. *Collins,* 1 Cal.2d 147, 153 [33 P.2d 1009, 93 A.L.R. 956].)

It is apparent from an analysis of the liquor fair trade law, however, that it bears no relation at all to the purported objective of promoting temperance. While the stated purpose of the law is to restrict the sale and consumption of alcoholic beverages, the use of fair trade contracts as a means necessarily guarantees that that objective will not be achieved. By attempting to achieve temperance in the sale of alcoholic beverages by regulation of the retail price through the use of this type of fair trade law, the Legislature has used the very form of regulation which is designed to promote rather than restrict trade. As has already been pointed out, the stated purpose of general Fair Trade Acts is to protect the goodwill of the producer in his brand name or trade-mark and in this way to promote and encourage trade by preventing unfair competition. (*Old Dearborn etc. Co.* v. *Seagram etc. Corp., supra,* 299 U.S. 183, 195; *Max Factor & Co.* v. *Kunsman, supra,* 5 Cal.2d 446, 454-455.) To this end, each brand or trade-mark owner is given the uncontrolled discretion to decide whether or not and at what amount to fix the price at which his product will be sold at retail. Active competition and a healthy trade are assured by the fact that uniform prices are maintained only as to the same brand and the prices are set by those having the greatest interest in promoting the product.

The liquor fair trade law does not prevent, and indeed is designed to insure, competition between different brands. The price-fixing scheme is imposed only upon a branded or trade-marked alcoholic beverage ''which is in fair and open competition with alcoholic beverages of the same general class produced by others.'' (Bus. & Prof. Code, § 24750.) A producer may enter into extensive competition or engage in a price war with competing distillers, and where, as in the alcoholic beverage industry, there exists a great variety of different brands of the same product type, competition between brands is likely to have as great an effect upon prices at the retail level as competition between retailers with regard to the same brands.

Furthermore, there is no limit to the number of brands that can be put on the market for each type of alcoholic beverage. The same product may be sold at the retail level at different prices so long as different labels are used. Thus, a manufacturer can establish different prices for the same product to increase consumption. Wholesalers and retailers can and often

do set their own prices for liquor merely by purchasing it in bulk and selling it under their own brand name. Indeed, one retailer may own many brand names and be in direct competition with the producer of the liquor which he buys who is selling it at that store under his own brand name.[5] Retailers may also compete for the exclusive privilege of handling certain brands. As a result, competition is not limited to the producing or manufacturing level but exists at the wholesale and retail levels as well.

The conclusion that the liquor fair trade law has no relation to promoting temperance is reinforced, and in fact is compelled, by the fact that no standards or limitations are placed on the power to fix the price at which liquor will be sold at retail and that that power is given to those who are not only private persons having no responsibility to the government but are those most interested in promoting the trade in alcoholic beverages and in making the greatest profit. Nothing in the act gives the department or any other official arm of the government any voice or control in the establishment of the retail price.

Although the United States Supreme Court has since the late 1930s generally upheld price-fixing regulations as a means of promoting the public welfare, the price-fixing power in those cases considered was either given to a government agency and accompanied by adequate standards (see, e.g., *Nebbia* v. *New York, supra,* 291 U.S. 502, 515-520) or its exercise was subject to the approval of a government commission (see, e.g., *Sunshine etc. Coal Co.* v. *Adkins,* 310 U.S. 381, 399 [84 L.Ed. 1263, 60 S.Ct. 907]).

The majority in *Allied Properties, supra,* referred to a number of states which have upheld price regulation of alcoholic beverages. (53 Cal.2d at p. 147.) In most of these states the regulations involved were significantly different from the California mandatory liquor fair trade law with regard to standards and controls over the prices fixed. In Rhode Island, Kentucky, and Arkansas retail prices were required to be set at certain percentages above cost. (*Nocera Bros. Liquor Mart* v. *Liquor Control Hearing Board,* 81 R.I. 186 [100 A.2d 652] ;

---

[5]It has been argued, for example, that fair trade actually contributes to the weakening of the competitive position of the independent retailer by encouraging the development of private brands sold at prices substantially below those of the fair-traded items to which the independent dealer is largely confined. (See Herman, *A Note On Fair Trade,* 65 Yale L.J. 23, 29.)

*Reeves* v. *Simons,* 289 Ky. 793 [160 S.W.2d 149, 150]; *Gipson* v. *Morley,* 217 Ark. 560 [233 S.W.2d 79, 80].) The percentages were set either by statute or administrative regulation and prices were therefore not subject to the uncontrolled discretion of the producer or wholesaler. Maryland does not attempt to regulate the retail price of alcoholic beverages, but only requires the filing of wholesale prices so that manufacturers and wholesalers will have adequate time to meet competing prices. (Maryland Ann. Code, art. 2B, § 109; *Dundalk Liquor Co.* v. *Tawes,* 201 Md. 58 [92 A.2d 560].) In Ohio the state liquor control commission establishes the price of liquor and determines the minimum markups for sales of beer and wine at retail. (Ohio Rev. Code, § 4301.02-19; *Pompei Winery* v. *Board of Liquor Control,* 77 Ohio L.Abs. 292 [149 N.E.2d 733].) While liquor prices in Massachusetts are established by fair trade contracts, the Alcoholic Beverage Control Commission must approve all prices as not being excessive, inadequate or discriminatory. (Mass. G.L., ch. 138, § 25c; *Supreme Malt Products Co.* v. *Alcoholic Beverages Control Com.,* 334 Mass. 59 [133 N.E.2d 775, 777]; see also, Kansas Stats. Ann., §§ 41-1111 to 41-1116.)

Prices established under our liquor act, on the other hand, may be set extremely low or prohibitively high and need not have any relation to the amount of retail sales or any other factor tending to further the purpose for which the act was assertedly designed. Since no standards are provided, there can be no review of prices to assure that they are not either excessive or inadequate. There is no assurance that those authorized to set prices will naturally tend to set them high to avoid excess consumption. On the contrary, the price setters are those most interested in maximizing the trade and profit in alcoholic beverages and least concerned with restricting sales at the retail level. In giving the power to regulate retail prices of alcoholic beverages to producers and brand owners, the Legislature could not have chosen a group less disposed to assure temperance in the sale and consumption of alcoholic beverages.[6]

[6]New York has repealed its mandatory liquor fair trade law because it found that compulsory resale price maintenance had had no significant effect upon the consumption of alcoholic beverages, upon temperance, or upon the incidence of social problems related to alcohol. (See *Seagram* v. *Hostetter,* 384 U.S. 35, 39 [16 L.Ed.2d 336, 86 S.Ct. 1254].)

The California act cannot be sustained on the basis of tending to further what has been regarded as "incidental objectives." While it may

We should not close our eyes to the fact that the act attempts to reduce consumption through regulation of prices rather than volume, and those who most require moderation are least influenced by inflated prices. To the extent the act is effective, it operates to promote temperance only in those who cannot afford the artificially high prices. (See Dunsford, *State Monopoly and Price-Fixing in Retail Liquor Distribution*, 1962 Wis.L.Rev. 454, 482-485.)

The granting of discretionary price-fixing power to private persons is also an unlawful delegation of legislative authority, and is so arbitrary as to amount to a denial of due process. (*Carter* v. *Carter Coal Co.*, 298 U.S. 238, 311 [80 L.Ed. 1160, 56 S.Ct. 855] ; *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners*, 40 Cal.2d 436, 448-449 [254 P.2d 29] ; *Blumenthal* v. *Board of Medical Examiners, supra,* 57 Cal.2d 228, 235-236.)

It is the position of the majority in *Allied Properties* (*supra,* 53 Cal.2d 141) and the position of the majority here, not that such delegation is proper, but that the liquor fair trade law does not involve a delegation of price-fixing authority at all. The reasoning is adopted from *Scovill Mfg. Co.* v. *Skaggs etc. Drug Stores, supra,* 45 Cal.2d 881, which involved the general Fair Trade Act, and held that there was no unlawful delegation in that statute. There it is stated: ''Here the acts of private parties in entering into contracts for the sale of commodities constitute the facts in contemplation of which the Legislature acted, and upon the existence of which the provisions of the enactment were to be applicable. The private contracts are no more legislative in character than are other acts or conduct of private parties undertaken as a prerequisite to the application of a statute. The consequence that the statute has become applicable, and conduct in violation thereof has become actionable is in no way due to the exercise of any assumed legislative power on the part of the contracting par-

be argued that the act was designed to promote orderly marketing conditions, this objective was clearly meant to be incidental to and in furtherance of the primary objective of promoting temperance.

Protecting a producer's goodwill in his brand or trade-mark cannot be regarded as an incidental objective since the act is mandatory and it is not conceivable that the purpose of the Legislature was to *force* all producers to set retail prices for their own benefit when in most cases such protection is not required and retail price fixing is generally regarded as against the economic interest of the producer. (See Fulda, *Resale Price Maintenance, supra,* 21 U.Chi.L.Rev. 175, 208-209; Telser, *Why Should Manufacturers Want Fair Trade?,* 3 J. Law & Econ. 86-87.)

ties." (*Scovill Mfg. Co.* v. *Skaggs etc. Drug Stores, supra,* 45 Cal.2d at p. 888.)

The *Scovill* decision is based on the theory that when a retailer purchases goods with knowledge of a price restriction established in a contract to which he is not a party, he has impliedly agreed to abide by such restriction and that prices are therefore established, not by the exercise of assumed legislative power, but voluntarily by contracts between private parties.

Whatever may be the validity of this reasoning with regard to entering into permissive contracts under the general Fair Trade Act,[7] it is clear that the liquor fair trade law, because of its mandatory character and its administrative and penal enforcement, is a price-fixing act rather than a law designed to enforce private contracts. Under the general Fair Trade Act, at least one party has discretion to determine whether his product will be fair-traded. The producer or brand owner of liquor, however, *must* set the price which is to be "implied" in all sales to retailers. When a product cannot be sold except pursuant to a fair trade contract, it is evident that this contract is merely being used as a price-setting device. Indeed,

---

[7] *Scovill* was itself based upon a decision of the United States Supreme Court in 1936 which upheld the Illinois general Fair Trade Act against attack on grounds of due process and summarily disposed of the issue of delegation with the statement that since the products were acquired by the noncontracting retailers with knowledge of the restriction, it "ran with the acquisition and conditioned it." (*Old Dearborn etc. Co.* v. *Seagram etc. Corp., supra,* 299 U.S. 183, 194.)

This implied contract theory, first enunciated by *Old Dearborn* in a perfunctory manner and in terms confusing property with contract rights, has been rejected in a similar situation by the United States Supreme Court (*Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U.S. 384 [95 L.Ed. 1035, 71 S.Ct. 745, 19 A.L.R.2d 1119]) and has been criticized by many state courts and legal scholars. (See, e.g., *General Elec. Co.* v. *Wahle, supra,* 207 Ore. 302 [296 P.2d 635]; *Remington Arms Co.* v. *Skaggs, supra,* 55 Wn.2d 1 [345 P.2d 1085]; *Bulova Watch Co.* v. *Zale Jewelry Co., supra* (Wyo.) 371 P.2d 409; 1 Davis, Administrative Law Treatise, § 2.14, p. 147; 45 Minn.L.Rev. 169, 181; 47 Iowa L.Rev. 208, 214; 37 Colum.L.Rev. 447, 459-460; *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, supra,* 40 Cal.2d 436, 452, dissenting opinion of Traynor, J.) As these authorities have recognized, the device of implying agreement to requirements or regulations known to contracting parties could as well be used to justify a law requiring a whole industry to follow in its sales contracts such conditions as to price or quality as are fixed by two private individuals in their uncontrolled discretion. When the alternative to following established prices or other conditions is not renegotiation of sales contracts but inability to enter into such contracts, enforcement of the prices upon nonsigners should, as noted by the United States Supreme Court, be regarded as price fixing by compulsion. (*Schwegmann Bros.* v. *Calvert Distillers Corp., supra,* 341 U.S. at pp. 390-395.)

since 1961, prices are set by filing a schedule with the department rather than entering into fair trade contracts. (Bus. & Prof. Code, § 24755, as amended by Stats. 1961, ch. 635, § 4.)

The method of enforcement in the liquor fair trade law conclusively demonstrates that the act does not merely enforce private contracts. Prices established pursuant to the general Fair Trade Act are maintained by the usual contractual remedies of private suit for injunction and damages. (Bus. & Prof. Code, § 16904.) On the other hand, the state itself, through the power of the Department of Alcoholic Beverage Control to suspend and revoke licenses, is the principal enforcer of retail liquor prices.

The majority apparently argue that the *function performed* by those establishing prices in fair trade contracts is determinative of whether there has been a delegation of legislative power and that the function performed by the producer under both acts, being merely to set the price of his product on the basis of his own personal interest, is the same. It is not, however, the function performed by the price setter, but the effect the law gives to the exercise of that function, that is crucial to the question whether there has been a delegation of legislative power. (See 1 Davis, Administrative Law Treatise, § 2.15, pp. 145-147.) The function performed by two private contracting parties may be the same, but the imposition of the law upon those parties of the obligation thereby created would not amount to a delegation whereas the imposition of the obligation upon all people in this state or in a particular industry may well amount to a delegation of legislative power. However minimal may be the delegation of authority when the law implies a known price term in a contract and makes it enforceable by the normal contractual remedies of damages and injunction, it cannot be denied that there is a delegation of state power when the effect given the specification of a price in a fair trade contract is its enforcement against those not parties to the contract by an administrative agency of the state.

The general Fair Trade Act provides a private remedy for a private purpose. The liquor act provides a public remedy for a public purpose. It is therefore evident that the liquor fair trade law, rather than affording a method for assuring that private parties live up to their voluntary agreements, is a price-fixing act.

· Once the act is seen for what it really is and what many authorities recognize it to be, that is an authorization to pro-

ducers and brand owners to fix the price at which liquor must be retailed, its invalidity becomes obvious. "While the delegation of governmental authority to an administrative body is proper in some instances, the delegation of absolute legislative discretion is not. To avoid such a result it is necessary that a delegating statute establish an ascertainable standard to guide the administrative body." (*State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, supra,* 40 Cal.2d 436, 448.)

In the *Thrift-D-Lux* case this court considered an act providing for the creation of a State Board of Dry Cleaners consisting of six members appointed by the Governor from various levels of the cleaning industry and one appointed from the general public. The board was authorized to establish minimum price schedules for cleaning, dyeing, and pressing services within specified areas on petition of 75 percent of the licensed cleaners in those areas. Those prices were required to be reasonable and just with regard to what will enable cleaners, dyers or pressers in the various areas to furnish modern, proper, healthful and sanitary services, using such appliances and equipment as will minimize the danger to public health and safety incident to such services. The prices were enforced by injunctive relief. While some members of the court felt that the board took on an official character and that sufficient standards were provided, the act was held to constitute an unlawful delegation of legislative power to those directly interested in the regulations they were authorized to promulgate. (40 Cal.2d at p. 448.)

In *Blumenthal* v. *Board of Medical Examiners, supra,* 57 Cal.2d 228, 235, we relied on *Thrift-D-Lux* in holding that the requirement of serving a five-year apprenticeship in this state or of having been licensed for five years in another state in order to obtain a license as a dispensing optician was an arbitrary delegation of legislative power in that it conferred upon presently licensed dispensing opticians the unlimited and unguided power to exclude from their profession any or all persons.

The delegation by the liquor fair trade law of the power to fix retail prices is clearly more arbitrary than the delegation in *Thrift-D-Lux,* which contained some standards and was directed to a group having at least the color of an administrative body. The present delegation of price-fixing power is, as in the *Blumenthal* case, a delegation to purely private persons who are directly interested in the consequences of their action

unaccompanied by any guide as to how that power should be exercised. Such a delegation violates due process guaranteed by the federal Constitution and is an unlawful delegation of legislative power under our own Constitution. (*Carter* v. *Carter Coal Co., supra,* 298 U.S. 238, 311; Cal. Const., arts. III, § 1, and IV, § 1.)[8]

The conclusion that the statute is unconstitutional makes it unnecessary for me to discuss whether the 1961 amendments to the act are retroactive under the rules announced in *In re Estrada,* 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948].

I would reverse the judgment.

McComb, J., concurred.

Appellant's petition for a rehearing was denied December 28, 1966. McComb, J., and Peters, J., were of the opinion that the petition should be granted.

---

[8]Section 1 of article III provides for the separation of the executive, legislative and judicial powers of this state, and prohibits any branch from delegating any portion of its authority to one of the other branches. Section 1 of article IV vests in the state Legislature the exclusive legislative function.